THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NATIVIDAD ARREDONDO, Defendant-Appellant.

First District (4th Division)    No. 1—07—2825

Opinion filed October 8, 2009.

Michael J. Pelletier and Jean Park, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Mary P. Needham, and Mikah Soliunas, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

Defendant, Natividad Arredondo, appeals his convictions on two counts of aggravated driving under the influence of alcohol and his sentence of two concurrent terms of two years in prison. Defendant contends the circuit court violated Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) by failing to ask the potential jurors during *voir dire* whether they understood and accepted the principles set forth in *People v. Zehr*, 103 Ill. 2d 472 (1984). We reverse and remand for a new trial.

We adopt the State's statement of facts verbatim:

"Officer Yasir Ramos, a five-year veteran of the Chicago Police Department currently assigned to the 9th District, was on patrol with his partner, Officer Michael Tomaso, on June 3, 2006. On that day, Officer Ramos was working beat 924, in uniform, driving in a

patrol vehicle. Sometime after 8 p.m., he and his partner were called to the location of 3108 South Aberdeen, regarding a disturbance call involving teenagers.

As Officers Ramos and Tomaso arrived at the location, they did not see a disturbance. Instead, Officer Ramos observed a two-door, dark colored Ford make a right-hand turn from 31st Street and park on Aberdeen. Officer Ramos and his partner approached the location of the disturbance call and saw a man standing on [the] street flagging them down. They stopped their patrol car and exited the vehicle to speak to him. While Officer Ramos and his partner were approaching the man on the street, Officer Ramos noticed a man sitting in the Ford on the west side of the street. Officer Ramos noticed that the car was running, in a parked position, and there was no one else in the car.

While he was speaking to the man on the street, Officer Ramos kept his eye on the man in the parked car. Officer Ramos observed that the man was having a difficult time stepping out of the vehicle, and thought the man may have been sick. Officer Ramos then approached the man, whom he identified in court as defendant. Defendant was behind the driver's wheel of the vehicle. Officer Ramos asked defendant if he was okay, and when defendant did not respond, the officer spoke to defendant in Spanish.

Initially, as he approached defendant's vehicle, Officer Ramos observed an open can of Budweiser in the center console. As he drew even closer, the officer observed a strong odor of alcohol coming from defendant's breath, and noticed that his eyes were bloodshot and glassy. Officer Ramos noticed that defendant was speaking in a slurred manner and behaving in a 'sluggish manner.' Officer Ramos then asked defendant if he had a driver's license and insurance; defendant was unable to produce either. Officer Ramos later learned that defendant's driving privileges were revoked, and defendant did not have a valid driver's license. Officer Ramos asked defendant if he needed medical attention, had any physical disabilities, or if he was taking any medication; defendant indicated he did not and was not. Officer Ramos asked defendant to step out of his vehicle to perform field sobriety tests. At that point, Officer Ramos believed defendant was possibly under the influence of alcohol; defendant needed to use his vehicle to steady himself as he stepped out of his car.

Officer Ramos directed defendant to the sidewalk area next to the street to administer the tests. Officer Ramos first administered the horizontal gaze nystagmus (hereinafter 'HGN') test. Officer Ramos explained and demonstrated this test to defendant. Defendant indicated that he understood the instructions, and although he completed the test properly, he showed signs of impair-

ment. Defendant exhibited all six signs of impairment according to the HGN test including: lack of smooth pursuit; 'onset prior to 45 degrees' in both eyes, also known as 'onset of DEH prior to 45 degrees,' which [meant] that at a 45 degree angle defendant's eyes began flickering rapidly; and that defendant had 'a distinct nystagmus at maximum deviation' in both eyes.

Officer Ramos also explained the finger-to-nose [test], the walk-and-turn test, and the one-legged stand test to defendant. Defendant *** was unable to perform those tests due to his condition. During the attempted administration of the field sobriety tests, defendant had to constantly hold a fixed object, and had a difficult time balancing himself. Because defendant did not perform or complete the finger-to-nose, walk-and-turn, and one-legged stand tests, he was deemed to have failed. Officer Ramos then read defendant his *Miranda* warnings in Spanish, from a pre-printed card. Defendant appeared to understand these warnings, and Officer Ramos and his partner escorted defendant to the patrol car to make sure he did not fall.

While they were transporting defendant to the 9th District station, the officers noticed a distinct odor of alcohol in the squad car. Defendant was 'having a rough time walking into the police station,' and was unable to stand without assistance.

Chicago Police Officer Len Nakoff was certified as a breathalyzer technician on the evening of the incident. Officer Nakoff stated that the 9th District station uses an Intox EC/IR machine, serial number 4078, to administer its breathalyzer tests. Officer Nakoff was *** licensed on that machine and had performed a few hundred tests on it. Officer Nakoff knew that the machine was regularly tested for accuracy, and that the tests were recorded in the Chicago Police Department logbook kept near the machine. The information in the logbook included: the date of test administration, the defendant's name, the results of the tests, the officer's name administering the test, the arresting officers' names, and a court date. Only police officers have access to the log book, and the station is required by law to keep the logbook.

At trial, Officer Nakoff was shown a portion of the logbook which contained defendant's test results; the log was entered into evidence without objection. Officer Nakoff explained that the machine was tested on May 22, 2006, by Sergeant Boone of the Illinois State Police. On that day, the machine was certified accurate, and the next certification of the machine was performed on July 30, 2006. On that day, the machine was also certified as accurate by Sergeant Boone of the Illinois State Police.

Officer Nakoff explained that after the relevant information was entered into the machine, it performed a self-check. The informa-

tion manually entered into the machine included: defendant's name, date of birth, driver's license number if they had one, the issuing state of the license, the administering officer's name, star number, the arresting officer's name, star number, and county of arrest. Officer Ramos was present during the administration of defendant's breath test so that he could translate Officer Nakoff's instructions to defendant into Spanish. On defendant's third attempt, he was able to successfully perform the test, and a ticket was issued registering defendant's [blood alcohol content] as .223; the legal limit in the State of Illinois is .08.

Defendant's certified driving abstract was admitted; it indicated that defendant's driving privileges were revoked on June 3, 2006. People's exhibits #1 through 10 were admitted into evidence without objection. The defense moved for [a] directed verdict, which the trial court subsequently denied. The People rested.

The defense then called Miguel Villalobos, a friend of the defendant. Miguel testified that he and defendant attended a party at defendant's brother's home located at 3114 South Aberdeen on the evening of the incident. According to Miguel, although defendant appeared to be drunk at the party he was not drinking. At some point during the evening, defendant and Miguel borrowed Miguel's sister-in-law's car and left the party to drive to Jewel to get some beer and hot dogs. Miguel testified that he drove, and that when they returned from Jewel, defendant was sitting on the passenger's side of the vehicle.

According to Miguel, when he and defendant were returning from Jewel, there were 'gang bangers' standing in the street throwing eggs at cars. Miguel and defendant's brother took the groceries inside the house while defendant remained outside, arguing with the gang bangers. Miguel testified that the next time [he] came outside, approximately 10 to 20 minutes later, both the gang bangers and defendant were gone.

The defense then called Mario Arredondo, defendant's brother. Mario testified that [he] had lived at 3114 South Aberdeen for approximately 10 years. According to Mario, defendant was not drunk that evening, 'he was happy'; he had never seen defendant completely drunk before. [However], Mario also testified that defendant never drove the car to Jewel because defendant was 'drunk.' Additionally, Mario said that as they began driving, there were gang bangers lurking about, who began throwing eggs and rocks at the car. Mario testified that defendant argued with those gang bangers and when the police arrived, they arrested defendant instead of the gang bangers.

The defense also called Father Peter Funk. Father Funk resided at a monastery located at 3111 South Aberdeen for approximately

10 years. At about 8:15 p.m. on June 3, 2006, Father Funk heard a disturbance outside of the church. He went up to the church tower to watch, and observed a group of 10 to 12 children on bicycles blocking the street and 'causing trouble.' Father Funk went out into the street to tell the kids to leave, but they began mouthing off to him, and refused to leave. He returned to the monastery and called 911.

According to Father Funk, 'what happened next is pretty foggy.' He saw one individual get out of a car when the police arrived. Father Funk then saw another individual, defendant, remain by that same car and begin arguing with the children who had been in the street. Based on defendant's demeanor and behavior, he believed defendant was under the influence of alcohol. Father Funk said that defendant's Spanish seemed slurred, and his movements were slow.

When the police officers arrived, Father Funk explained the disturbance with the children to them and recalled that defendant was still inside of the car on the street. According to Father Funk, the police officers put one of the minors in the squad car and another one was 'sent away.' "

At the conclusion of trial, the circuit court instructed the jury as to the presumption of innocence, the State's burden of proof, defendant was not required to prove his innocence, and defendant's decision not to testify may not be considered when arriving at a verdict. The jury convicted defendant of two counts of aggravated driving while under the influence of alcohol. The circuit court sentenced defendant to two concurrent terms of two years in prison. Defendant filed this timely appeal.

Defendant contends the circuit court violated Rule 431(b) when it failed to ask the potential jurors during *voir dire* whether they understood and accepted the principles set forth in *Zehr*. Where an issue concerns compliance with a supreme court rule, review is *de novo*. *People v. Graham*, 393 Ill. App. 3d 268, 270 (2009).

The State contends defendant waived review by failing to raise an objection at trial (*People v. Enoch*, 122 Ill. 2d 176, 186 (1988)); however, we address defendant's argument under the plain error exception to the waiver rule as the claimed error is of such a magnitude as to deny him a fair and impartial trial. 134 Ill. 2d R. 615(a); *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

In support of his argument, defendant cites *People v. Zehr*, 103 Ill. 2d 472 (1984). In *Zehr*, our supreme court held a trial court erred during *voir dire* by refusing defense counsel's request to ask questions about the State's burden of proof, the defendant's right not to testify, and the presumption of innocence. *Zehr*, 103 Ill. 2d at 476-78. The supreme court held:

"[E]ssential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him." *Zehr*, 103 Ill. 2d at 477.

To ensure compliance with *Zehr*, the supreme court amended Rule 431(b) in 1997 to provide: "[i]f requested by the defendant," the court shall ask the prospective jurors whether they understand and accept the *Zehr* principles. 177 Ill. 2d R. 431(b). The rule sought "to end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." 177 Ill. 2d R. 431, Committee Comments, at lxxix. The appellate court held that Rule 431(b) as amended in 1997 "does not require the judge to ask the questions unless defendant's counsel has asked the court to do so." *People v. Williams*, 368 Ill. App. 3d 616, 623 (2006); see also *People v. Foreman*, 361 Ill. App. 3d 136 (2005).

■ Effective May 1, 2007, the supreme court again amended Rule 431(b), deleting the language "[i]f requested by the defendant," and leaving the remainder of the rule unchanged. Rule 431(b) now reads in pertinent part:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

Thus, Rule 431(b), as amended effective May 1, 2007, currently imposes a *sua sponte* duty on the circuit court to question each potential juror as to whether he understands and accepts the *Zehr* principles. Such questioning of the potential jurors is no longer dependent upon a request by defense counsel.

The defendant's trial took place after the effective date of the 2007 amendments. Therefore, the 2007 amended version of Rule 431(b) is controlling.

In the present case, the circuit court commenced *voir dire* by addressing the entire venire. The court told the venire:

"[Defendant], as other persons charged with crimes in this country, is presumed to be innocent of the charges that bring him

before you. That presumption cloaks him now at the onset of this trial and it will continue to cloak him throughout the course of the proceeding. \*\*\*

It is absolutely essential as we select this jury that each of you understand and each of you embrace these fundamental principles. That is all persons charged with a crime are presumed to be innocent. And that it is the burden of the State who brought the charges to prove that the defendant is guilty beyond a reasonable doubt.

Now, what this means is that Mr. Arredondo, as the defendant, has no obligation to testify in his own behalf and he does not have any obligation to present any witnesses in his defense. He may simply sit here and rely upon what he and his attorneys perceive to be the inability of the State to present sufficient evidence to meet their burden.

Should that happen, you will have to decide the case on the basis of the evidence presented by the State's Attorney. The fact that the defendant does not testify must not be considered by you in any way in arriving at your verdict.

However now, should the defendant elect to testify or should he and his attorney present witnesses in his behalf, you are to consider that evidence in the same manner and by the same standard as evidence presented by the State's Attorney. The bottom line, however, is that there is no burden upon the defendant to prove that he is innocent. It is the State's burden to prove that the defendant is guilty beyond a reasonable doubt."

During these introductory comments, the circuit court failed to ask the potential jurors, either individually or as a group, whether they understood and accepted the four *Zehr* principles as required under the 2007 amended version of Rule 431(b).

Following these introductory comments, 12 prospective jurors were seated in the first panel. The circuit court asked those prospective jurors, "Is there anything that I read to you about the charges concerning [defendant] that will prevent you from being fair and impartial to both sides in this case? If you can't be fair and impartial, let me know by raising your hand."

One person raised his hand and stated that he was 65 years old, that he did not understand "the whole procedure" and that he did not understand English. The circuit court then addressed the remaining members of the panel as follows:

"Is there anybody else that feels they can't be fair and impartial to both sides in this case, because of the charges? Let the record reflect no one else held up their hand.

If you feel that at the end of this trial that the State has met their burden, will you sign a guilty verdict form? If you won't be able to sign a guilty verdict form, please let me know by raising your hand.

No one raised their hand.

On the other hand, if you feel that the State has not met their burden at the end of this trial, will you be able to sign a not guilty verdict form? If you will not be able to sign a not guilty verdict form, please let me know by raising your hand.

None of the 12 jurors have raised their hand.

Will you hold it against [defendant] if he does not call witnesses to testify on his behalf? If you will hold it against him, please raise your hand.

None of the prospective jurors raised their hand, for the record.

Will you hold it against [defendant] if he does not testify in this case? If you will hold it against him, please let me know by raising your hand.

None of the 12 raised their hand."

Following the questioning of the first panel, five jurors were chosen.

The circuit court then called 12 more prospective jurors from the venire. The circuit court addressed those prospective jurors as follows:

"Is there anything about the charges that I read to you concerning [defendant] that would prevent you from being fair and impartial jurors to both sides in this case? If you cannot be fair and impartial, please let me know by raising your hand.

Let the record *** reflect none of the 12 raised their hand.

At the end of this trial, if you feel the State has not met their burden, will you be able to sign a not guilty verdict form? If you won't be able to sign that verdict form, you should let me know by raising your hand.

None of the 12 raised their hands.

If you feel that at the end of this trial that the State has met their burden, will you be able to sign a guilty verdict form? If you will not be able to sign a guilty verdict form, please let me know by raising your hand.

None of the 12 have raised their hands.

Will you hold it against [defendant] if he does not testify in this case? And will you hold it against him if he does not call witnesses in this case? If you will hold it against him, please let me know by raising your hand.

None of the 12 have raised their hand."

From this panel, five additional jurors were chosen.

Finally, the circuit court called 12 more prospective jurors from the venire in order to choose the remaining 2 jurors, and 2 alternates. The circuit court asked these prospective jurors, "Again, the same questions. Is there anything about the charges in this case that will prevent either one of you from being fair and impartial jurors to both sides in this case? If you could not be fair, please let me know by raising your hand."

One person raised her hand and stated she could not be fair and impartial. The circuit court then addressed the remaining members of the panel as follows:

> "If you feel at the end of this trial that the State has not met their burden, will you be able to sign a not guilty verdict form? If you will not be able to sign a not guilty verdict form, let me know by raising your hand.
>
> For the record, none of the 12 raised their hand.
>
> If you feel the State has met their burden and proven [defendant] is guilty beyond a reasonable doubt, would you be able to sign a guilty verdict form? If you will not be able to sign a guilty verdict form, let me know by raising your hand.
>
> None of the 12 raised their hands.
>
> Will you hold it against [defendant] if he does not testify in the case? If you will hold it against him, let me know by raising your hand.
>
> None of the 12 raised their hands.
>
> Will you hold it against [defendant] if he does not call witnesses in his case? If you will hold it against him, please let me know by raising your hand.
>
> None of the 12 raised their hands."

From this panel, two jurors and two alternates were chosen.

■ On appeal, defendant contends the circuit court committed reversible error by failing to comply with the 2007 amended version of Rule 431(b), which requires the circuit court to question the prospective jurors as to whether they "understand[ ] and accept[ ]" the four *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. May 1, 2007). In the present case, as recounted above, the record indicates the circuit court failed to question any of the prospective jurors regarding their understanding and acceptance of the first *Zehr* principle, defendant is presumed innocent of the charges against him. With regard to the second *Zehr* principle, the State's burden of proof, the circuit court questioned the prospective jurors as to whether they would sign the appropriate verdict form if the State had or had not met its burden of proof. This was a "general question concerning the juror's willingness to follow the law" (177 Ill. 2d R. 431, Committee Comments, at lxxix) which did not comply with the 2007 amended rule's requirement that the court

question the prospective jurors regarding their understanding and acceptance of the State's burden. See also *People v. Anderson*, 389 Ill. App. 3d 1, 8 (2009) (holding that such a general question regarding the prospective jurors' willingness to follow the law did not comply with the 2007 amended version of Rule 431(b)). The circuit court questioned the prospective jurors as to whether they accepted the third and fourth *Zehr* principles, that defendant is not required to testify or offer evidence on his behalf, but the court never explicitly questioned the prospective jurors regarding their understanding of said principles.

The State contends the circuit court substantially complied with the 2007 amended version of Rule 431(b) and therefore that no error occurred. The State's contention is without merit. The principles of statutory construction apply to supreme court rules. *People v. Anderson*, 389 Ill. App. 3d at 7. The primary goal is to ascertain and give effect to the rule's drafters by relying on the plain and ordinary language of the rule. *Anderson*, 389 Ill. App. 3d at 7. The 2007 amended version of Rule 431(b) explicitly requires the circuit court "shall ask each potential juror, individually or in a group, whether that juror understands and accepts" the four *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. May 1, 2007). In the present case, the circuit court did not ask the potential jurors whether they understood and accepted all four *Zehr* principles. Therefore, the court failed to comply with the 2007 amended version of Rule 431(b) and committed error.

Next, the State contends the error was harmless, as it was not a "structural error" rendering the criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. See *Washington v. Recuenco*, 548 U.S. 212, 218 n.2, 165 L. Ed. 2d 466, 474 n.2, 126 S. Ct. 2546, 2551 n.2 (2006) (defining the types of "structural errors" that require automatic reversal). The State also cites *People v. Stump*, 385 Ill. App. 3d 515, 522 (2008), in which the Fourth District Appellate Court applied a harmless error analysis to the circuit court's failure to question the prospective jurors as to whether they understood and accepted all of the *Zehr* principles as required by the 2007 amended version of Rule 431(b). The *Stump* court held the error did not affect the jury's verdict where all four *Zehr* principles were addressed to each juror at some point during *voir dire* by either the judge or defense counsel and where the evidence of the defendant's guilt was overwhelming. *Stump*, 385 Ill. App. 3d at 521-22.

However, in *People v. Anderson*, 389 Ill. App. 3d 1 (2009), the First District Appellate Court declined to follow the decision in *Stump* that a harmless error analysis applied to the circuit court's failure to ques-

tion the prospective jurors as to whether they understood and accepted all the *Zehr* principles as required by the 2007 amended version of Rule 431(b). In *Anderson*, unlike in *Stump*, neither defense counsel nor the circuit court addressed each juror with all four of the *Zehr* principles during *voir dire*. *Anderson*, 389 Ill. App. 3d at 9. The *Anderson* court also noted the court in *Stump* chose to apply a harmless error analysis despite acknowledging the " 'mandatory nature of the rule' " signified presumptive prejudicial error. *Anderson*, 389 Ill. App. 3d at 9, quoting *Stump*, 385 Ill. App. 3d at 520. The *Anderson* court concluded the circuit court's failure to fully comply with its duty under the 2007 amended version of Rule 431(b) was so serious an error, it denied defendant a substantial right and a fair trial and necessitated reversal. *Anderson*, 389 Ill. App. 3d at 9.

Most recently, in *People v. Graham*, the First District Appellate Court again considered whether the circuit court committed reversible error by failing to question the potential jurors whether they understood and accepted all four of the *Zehr* principles as required under the 2007 amended version of Rule 431(b). The *Graham* court noted the Fourth District Appellate Court's decision in *Stump* to apply a harmless error analysis, and it also noted the First District Appellate Court's decision in *Anderson* declining to apply such a harmless error analysis. The *Graham* court further noted, subsequent to *Anderson*, the supreme court issued an opinion in *People v. Glasper*, 234 Ill. 2d 173, 199-200 (2009), applying a harmless error analysis to the prior 1997 version of Rule 431(b). The *Graham* court then held:

> "The decision in *Glasper* does not alter the result in this case. The [supreme] court emphasized that 'this holding is limited to the [1997] version of Rule 431(b)(4) that was in effect at the time of the instant trial, and would not necessarily apply to subsequent versions of the rule.' *Glasper*, 234 Ill. 2d at 200. Unlike the [1997] version of Rule 431(b) at issue in *Glasper*, under the [2007] version of the rule at issue in the present case, the rule's protections are now extended to all defendants, not just those who chose to invoke them.
>
> \*\*\*
>
> Our supreme court has yet to construe the 2007 version of Rule 431(b) at issue in this case. Until that time, we shall continue to follow *Anderson* and find that a trial judge's failure to comply with Rule 431(b) denies a defendant a substantial right and thus a fair trial and obviates the need to inquire into the harmfulness or the measure of prejudice to the defendant." *Graham*, 393 Ill. App. 3d at 276.

We continue to adhere to the well-reasoned decisions in *Anderson* and *Graham* and hold the circuit court's failure to fully comply with

the 2007 amended version of Rule 431(b) denied defendant a substantial right and a fair trial and obviated the need to inquire into the prejudice to defendant.

We also note in *People v. Wilmington*, 394 Ill. App. 3d 567, 572-75 (2009), a panel of the First District Appellate Court expressly followed *Anderson* and *Graham* and held the circuit court's failure to question the prospective jurors regarding their understanding and acceptance of defendant's right not to testify constituted plain error necessitating reversal and remandment for a new trial. In apt language, the *Wilmington* court stated:

> "[W]e return to the State's contention that substantial compliance with Rule 431(b) was sufficient. The role of the appellate court is to decide the issue before us. Should the Illinois Supreme Court decide that substantial compliance is all that Rule 431(b) requires, it has the ability to allow waiver of the rule or to create an exception. This court does not hold such power. We are also of the view that if we create an exception to compliance with Rule 431(b), the small trickle of these cases which is now occurring will turn into a cascade. We wish to avoid that result." *Wilmington*, 394 Ill. App. 3d at 575.

We agree with the *Wilmington* analysis. Accordingly, we reverse and remand for a new trial.

The evidence presented at trial was sufficient to prove defendant guilty beyond a reasonable doubt. Therefore, double jeopardy does not bar a retrial.

As a result of our disposition of this case, we need not address the other arguments on appeal.

We empathize with the many capable trial judges who struggle, as we do, with the practical application of Rule 431(b) and hope this decision does not add to that struggle.

Reversed and remanded.

GALLAGER and NEVILLE, JJ., concur.