**SIXTH DIVISION**
**February 11, 2010**

No. 1-08-0194

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 06 CR 26796 |
| | ) | |
| TERRELL HAMMONDS, | ) | Honorable |
| | ) | Marcus R. Salone |
| Defendant-Appellant. | ) | Judge Presiding |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

On August 29, 2007, defendant Terrell Hammonds was convicted by a jury of delivering a controlled substance (720 ILCS 570/401(d) (West 2006)). On December 10, 2007, the trial court sentenced defendant to seven years imprisonment and denied defendant's posttrial motion. On this direct appeal, defendant seeks a reversal of his conviction and a new trial, due to five alleged errors. Defendant claims that the trial court erred : (1) by giving the third paragraph of Illinois Pattern Jury Instructions, Criminal, No. 17.05A (4th ed.) (hereinafter IPI Criminal 4th) which specified that a drug "delivery"did not require a transfer of money or consideration; (2) by allowing police officers to testify, over defendant's hearsay objection, about radio messages received from other officers, who were also trial witnesses; (3) by failing to ask potential jurors

1

No. 1-08-0194

whether they understood and accepted certain principles of law listed in Illinois Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007); (4) by refusing to rule, until after defendant testified, on defendant's motion in limine concerning the admissibility of defendant's prior convictions for impeachment purposes. Defendant also claims that (5) prosecutorial misconduct during the State's rebuttal closing denied defendant a fair trial. After considering carefully each of defendant's claimed errors, we find that a new trial is not warranted.

## BACKGROUND

Defendant's two-day trial commenced on August 28, 2007 with jury selection, and culminated in a guilty verdict on August 29, 2007.

### Voir Dire

Following the swearing-in of the pool of potential jurors, the trial court informed the venire of certain principles of law, namely: (1) that a defendant is presumed innocent; (2) that he is not required to offer any evidence in his own behalf; and (3) that he must be proved guilty beyond a reasonable doubt. However, the trial court did not inform the potential jurors of a fourth principle of law, namely (4) that a defendant's failure to testify in his own behalf cannot be

2

No. 1-08-0194

held against him. The trial court also failed to ask the prospective jurors whether they understood and accepted these four principles of law.

With respect to these principles of law, the trial court stated, in pertinent part:

"Under the law, a defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during the deliberation on a verdict. It is not overcome from [sic] unless from all of the evidence in this you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilty of the defendant beyond a reasonable doubt. And this burden remains on the State throughout the case. The defendant is not required to prove his innocence nor is he required to present any evidence on his own behalf. He may rely on the presumption of innocence. You are the judges of the facts in this case ***."

The trial court did later inform the jury of all four principles of law during the jury instructions after the close of evidence.

Evidence at Trial

After jury selection and opening statements, the State presented its evidence. Defendant did not testify or call witnesses. On this appeal, defendant did not claim that the evidence at trial was insufficient to convict him. Nonetheless, we will still describe in detail the State's evidence at trial, since we will need to decide whether this evidence was overwhelming and whether the effect of any alleged error was rendered harmless by overwhelming evidence.

At trial, the State called four witnesses in its case-in-chief. Three witnesses were Chicago police officers, Marco DiFranco, Boonserm Srisuth, and Detective William Smith, who were members of the undercover narcotics investigation team that arrested defendant. The remaining witness was Paula Bosco Szum, a chemist with the Illinois State Police Crime Laboratory, who analyzed the evidence recovered after defendant's arrest.

The first officer to testify, Officer Srisuth, stated that he was part of a nine-person narcotics investigation team. In the late morning of November 11, 2006, he and other members of his team arrived in the neighborhood of Lamon Avenue and Thomas Street in Chicago, Illinois. Srisuth explained that, when his team anticipates making a controlled buy, the duties of the officers are divided among an "enforcement officer, [a] surveillance officer and [a] buy officer." On this

4

particular day, Srisuth was the buy officer; and thus he wore civilian clothes and drove an unmarked vehicle. The second witness, Officer DiFranco, was the surveillance officer; and Detective Smith, one of the enforcement officers, was the fourth witness to testify at trial.

Officer Srisuth testified that he responded to a radio transmission from the surveillance officer, Officer DiFranco.. At that point in the testimony, defendant objected on hearsay grounds. Over defendant's hearsay objection, Srisuth testified that he heard DiFranco state over the radio that "a male black wearing a black skull cap, black jacket, black sweatpants with a white stripe and white gym shoes *** was selling drugs" in the vicinity of 1057 North Lamon Avenue.

Officer Srisuth testified that, at approximately 11:14 a.m., he drove northbound on Lamon Avenue toward 105 North Lamon Avenue and observed defendant, who was the only person present in the area matching DiFranco's description. Srisuth parked his unmarked vehicle on Lamon Avenue, and defendant approached Srisuth's passenger window. Srisuth asked defendant if he had any "rocks," which Srisuth testified was "street terminology for crack cocaine." Srisuth testified that defendant asked him how many he wanted, to which Srisuth responded that he wanted only one. Srisuth testified that defendant

5

removed a small, green-tinted zip-lock bag from his mouth. Srisuth testified that the bag contained a white, rock-like substance. Defendant gave Srisuth the bag, and Srisuth gave defendant a pre-recorded ten dollar bill.

Officer Srisuth testified that, after the transaction was complete, he left the area and radioed the other officers that "a positive narcotics transaction" had occurred. He also provided the other officers with a physical description of defendant, including defendant's clothing and location. Srisuth testified that the surveillance officer later instructed him to drive by the vicinity of 1031 North Lamon. At that location, Srisuth observed defendant "being detained by the enforcement officer" and Srisuth identified defendant as "the individual that sold [Srisuth] the narcotics."

The State's second witness was Officer DiFranco, the surveillance officer. He testified that, at approximately 11:10 a.m. on November 11, 2006, he established a surveillance position on North Lamon Avenue where he had observed defendant loitering on the corner. DiFranco explained that as a surveillance officer, it was his responsibility to "monitor" the location and to keep the team informed. DiFranco testified that, on the day in question, he had "converted [himself] into a utility worker" and that he was driving an undercover

vehicle. From his surveillance position, which was approximately "two-and-a-half car lengths" from defendant, he observed an unknown male approach defendant and hold a brief conversation with him. Defendant then pulled a small item from his mouth and gave it to the unknown male. DiFranco observed the unknown male hand defendant money and leave the area. Based on his experience, DiFranco suspected that a narcotics sale had just occurred.

Officer DiFranco testified that he radioed the other officers on his team and informed them of what he had observed. Specifically, DiFranco testified that in his radio transmission, he described defendant as "a male black wearing a black skull cap, a black jacket, black sweatpants with a white stripe, and white gym shoes" and he informed the team of defendant's location. DiFranco testified that, in response to this radio call, Officer Srisuth arrived in "less than a minute." DiFranco observed Srisuth approach in an unmarked vehicle, which Srisuth "curbed" near 1057 Lamon Avenue. At that moment, DiFranco was positioned approximately "two-and-a-half car lengths" behind Srisuth's vehicle, and there were no other vehicles between his and Srisuth's vehicle. He testified that nothing blocked his view of either Officer Srisuth or defendant.

Officer DiFranco testified that, after Srisuth stopped his vehicle, DiFranco

observed defendant approach the passenger side of the undercover vehicle.

DiFranco observed defendant and Srisuth hold a brief conversation, after which

defendant retrieved a small item from his mouth and handed it to the buy officer.

DiFranco testified that, during the exchange, a "late model Grand Am *** curbed

right in front of [DiFranco] and behind the [buy] officer." DiFranco then

observed Srisuth's vehicle drive away, and he informed his team by radio that a

narcotics transaction had occurred.

Officer DiFranco testified that he "stayed in constant surveillance" of

defendant after Srisuth's vehicle departed. Defendant next approached the

driver's side of the white Grand Am. DiFranco observed defendant and the driver

of the

Grand Am hold a brief conversation, after which defendant pulled a small item

from his mouth and handed it to the driver. DiFranco testified that defendant

reached into his left pants pocket and "pulled out an unknown amount of United

States currency which he was holding." Defendant was "flipping them back, and

he then pull[ed] out an unknown amount of denomination, USC [sc] currency,

and he tender[ed[ it to the white male driver." DiFranco testified that the driver

then handed defendant "an unknown amount" of United States currency, and that

the Grand Am departed.

Officer DiFranco testifed that, after the Grand Am's departure, defendant started walking south on Lamon Avenue. DiFranco informed his team by radio of defendant's location while maintaining constant surveillance of defendant. DiFranco then observed the enforcement officers, Detective Smith and Officer Pentimone, arrive and exit their vehicle. After the enforcement officers detained defendant, DiFranco informed the rest of the team by radio of the detention. DiFranco also instructed "the buy officer to drive around the immediate area" in order "to see if that was the actual seller." Officer DiFranco observed Officer Srisuth drive by four or five minutes later, and DiFranco heard Srisuth inform the team by radio that defendant was the person who had sold drugs to Srisuth. Immediately after DiFranco testified about Srisuth's radio confirmation, the defense objected[1] and the objection was overruled.

Officer DiFranco testified that the enforcement officers arrested defendant and conducted a search of defendant. DiFranco observed that the officers reached into defendant's left pants pocket and retrieved a bundle of United States

---

[1]The trial court stated "overruled" immediately after defense counsel stated "objection." Thus, defense counsel did not state the basis for the objection. However, we presume from the context of the record that the basis was hearsay.

currency. The State's third witness was Paula Bosco Szum, a chemist with the Illinois State Police Crime Laboratory. The chemist was qualified as an expert in "the field of forensic chemistry and the analysis of narcotics" without objection from the defense. She testified that she analyzed evidence recovered in the case at bar[2] and that the item tested positive for the presence of cocaine and weighed one-tenth of a gram.

The State's fourth witness was Detective Smith, one of the enforcement officers who participated in defendant's arrest. Smith testified that, as an enforcement officer in an undercover operation, he was dressed in civilian clothes and drove an unmarked vehicle. Smith explained that, after the buy officer completes a narcotics purchase, the enforcement officer is notified and provided with a description of the seller. It is the role of the enforcement officer to detain the seller and place him into custody.

Detective Smith testified that, on November 11, 2006, he was working with his partner, Officer Jerry Pentimone, when he received a radio transmission from the buy officer, Officer Srisuth. At this point in the testimony, the defense made a

---

[2]This opinion omitted descriptions of the chain of custody since the defense raised no challenge to it, either at trial or on this appeal.

hearsay objection, which was overruled. Over the defense's objection, Smith testified to the contents of the radio transmission. Smith testified that Srisuth stated that he had completed a controlled purchase of narcotics and that Srisuth provided a description of the seller's physical appearance and clothing.

Detective Smith next testified that he received a radio transmission from the surveillance officer, Officer DiFranco. The defense objected again on hearsay grounds, and the objection was overruled. Detective Smith testified that, in the radio transmission, DiFranco confirmed that the buy officer had completed a transaction, and that DiFranco further stated that the seller had completed a second transaction and had started to walk southbound on Lamon.

Detective Smith testified that, after receiving a description by radio from both the buy officer and the surveillance officer, he proceeded to the area of North Lamon and observed a person matching this description. Officer Pentimone, who was driving, stopped their vehicle; and both officers exited and approached. Detective Smith then announced that they were police officers, and they detained defendant. After detaining defendant, Smith testified that he received a radio transmission from the surveillance officer, Officer DiFranco. At

this point in the testimony, the defense objected,[3] and the objection was overruled. Smith then testified to the contents of the radio transmission, which was a confirmation from DiFranco that they had detained the "right" individual.

Detective Smith further testified that he observed the buy officer, Officer Srisuth, drive by. Without defense objection, Smith testified that Srisuth radioed "confirming that [they did] have the right gentleman stopped." Smith's partner, Officer Pentimone, then performed a search of defendant and recovered $140 in United States currency from defendant's left front pants pocket. The money was in "different denominations, twenties, tens, fives and some singles." The officers looked for, but did not recover, the recorded ten dollar bill that was used in the undercover purchase. They also did not find any drugs present on defendant's person.

## Jury Instructions

After the detective's testimony, the jury was excused from the courtroom

---

[3]The witness had begun to answer the question when the defense counsel stated "objection." After the objection, the witness continued answering. Then the trial court interrupted the witness's answer to say "overruled," and the witness finished his answer. As a result, defense counsel did not have an opportunity to state the basis for his objection; however, we presume from the context of the record that the basis was hearsay.

No. 1-08-0194

and the trial court held a conference on jury instructions. Defense counsel stated that there was only one jury instruction in dispute. The prosecutor requested the first and third paragraphs of IPI Criminal 4th No. 17.05A; and the defense objected.

IPI Criminal 4th No. 17.05A provides in its entirety:

"17.05A Definition of Deliver

(1) The word 'deliver' means to transfer possession or to attempt to transfer possession.

(2) The word 'deliver' includes a constructive transfer of possession which occurs without an actual physical transfer. When the conduct or declarations of the person who has the right to exercise control over a thing is such as to effectively relinquish the right of control to another person so that the other person is then in constructive possession, there has been a delivery.

(3) A delivery may occur with or without the transfer or exchange of money, or with or without the transfer or exchange of other considertation."

13

No. 1-08-0194

The prosecutor explained to the trial court that she did not ask for paragraph 2, "because this [was] not a constructive transfer situation."

In his objection, the defense relied on the committee note accompanying the instruction. This note stated that "[g]enerally" when "the delivery in question was an actual physical transfer of possession, no definition of the term need be given to the jury, " since "[t]he term, in this sense, is commonly understood by the jury." IPI Criminal 4th No. 17.05A, Committee Note. However, the note also stated that "[p]aragraph (3) may be given when the Court believes it would help the jury understand the issue." IPI Criminal 4th No. 17.05A, Committee Note.

Relying on the committee note, defense counsel explained her objection, as follows:

> "DEFENSE COUNSEL: If you look at the committee notes, your Honor, for 17.05A, it states that when an offense involves a delivery and the evidence indicates that the delivery in question was an actual, physical transfer of possession, no definition of the term may be given to the jury. The term in this sense is commonly understood by the layman. That would be the basis of our objection to the entire instruction."

14

After listening to defense counsel, the trial court then ruled in defendant's favor, stating:

> "TRIAL COURT: Okay.
>
> It's out. It's out. Subject to the jury asking for a definition of delivery."

Even though the trial court had just ruled, the prosecutor interjected:

> "PROSECUTOR: But, Judge, if I can just say this?
>
> The committee notes say it need not, which to me is not – my understanding of that is that it is not necessary if it's not being asked for. I'm asking for it for a couple of reasons.
>
> First, I think the term deliver can be subject – I think it's a little confusing, the term deliver, where this just simplifies it. It just means a transfer of possession.
>
> Additionally, Paragraph 3, the State is asking for it because it is entirely relevant in this case because the [pre-recorded ten dollar bill was] not recovered. What this tells the jury, we don't need the [pre-recorded ten

dollar bill] because a delivery takes place regardless of an exchange of consideration, regardless of any money being exchanged or recovered. And I think that is absolutely relevant in this case.

They can ask for this as a clarification, but there is – there has been – this entire trial has been replete. Every single witness was questioned about [this pre-recorded ten dollar bill], making it as though it's entirely necessary for the delivery to take place and that's why we are asking for this instruction."

In response, the trial court reviewed the committee note, particularly the section that provided the court with discretion about whether to give paragraph 3, and the trial court held, with respect to paragraph 3, "[t]hat's all that needs [sic] be given." To clarify, the prosecutor asked if she should "take out [paragraphs] one and two and just do [paragraph] three" and the trial court agreed. Thus, the trial court reversed its prior ruling, and stated that paragraph 3 will be "given over defendant's objection."

Closing Argument

No. 1-08-0194

After the jury instruction conference, the State moved its exhibits into evidence, and both the State and the defense rested. The parties then proceeded to closing arguments.

In her closing argument, defense counsel challenged the police investigation, noting that the recorded ten dollar bill was not recovered and that the police chose not to submit the drug evidence for fingerprint or DNA testing.

Defense counsel discussed the missing ten dollar bill at length, stating:

"You don't have any [recorded] money. You

heard us talk extensively all day about [recorded]

money. [Recorded] money helps corroborate that they

have the right individual in custody, the individual that

supposedly was involved in that transaction.

You do not have any [recorded] money recovered off [defendant], and you have a lame hypothesis or excuse, I'm not sure what it is, of where that may have gone, in that he gave money to someone in a car.

Now, that is preposterous. He gave money to

someone in a car before that person ever gave any

money. That doesn't make any sense. He gave money

17

to someone in a car who easily could have been stopped by the Chicago Police Department.

This person wasn't even stopped. You don't know whether this person had [recorded] money on them."

In its rebuttal argument, the State responded:

"Counsel has talked to you about that. There are no [recorded funds] recovered in this case. You're going to receive the law from the judge. What he's going to tell you speaks directly to these [recorded funds].

For the offense of delivery to occur, you will receive an instruction that says a delivery may occur with or without the transfer or exchange of money, or with or without the transfer or exchange of other consideration.

You're not going to get an instruction that says you can't find this defendant guilty because there weren't [recorded funds] recovered, or there wasn't money recovered. It's not necessary.

18

Our law does not even require that the money be given or that money be taken or recovered. That's not the law. It doesn't matter. It doesn't matter."

Following closing arguments and jury deliberations, the jury found defendant guilty of delivery of a controlled substance, in violation of the Illinois Controlled Substances Act. 720 ILCS 570/401(d) (West 2006).

Post-Trial Motion and Sentencing

On September 27, 2007, defendant filed a motion for acquittal notwithstanding the verdict or, in the alternative, for a new trial. The motion alleged general grounds such as lack of due process and failure to prove guilt beyond a reasonable doubt. The one specific allegation was that the trial court erred by giving a jury instruction requested by the State, over defense objection.

On December 10, 2007, defendant filed an amended posttrial motion, which added the allegation that "[t]he Court erred by allowing Chicago police officers to testify to the content of their radio transmissions, thereby allowing the jury to hear impermissible hearsay evidence, and the state to bolster their case."

The trial court denied defendant's motion for a new trial. After arguments in aggravation and mitigation, the trial court sentenced defendant to seven years

No. 1-08-0194

in the Illinois Department of Corrections with a credit of 395 days. The trial court denied defendant's posttrial motion. This appeal followed.

ANALYSIS

On appeal, defendant claims that the trial court erred: (1) by giving the third paragraph of IPI Criminal 4th No. 17.05A which specified that a drug "delivery" did not require a transfer of money or consideration; (2) by allowing police officers to testify, over the defense's hearsay objection, about radio messages received from other officers, who were also trial witnesses; (3) by failing to ask potential jurors whether they understood and accepted the principles listed in Illinois Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007); (4) by refusing to rule, until after defendant testified, on defendant's motion in limine concerning the admissibility of defendant's prior convictions for impeachment purposes. Defendant also claims that (5) prosecutorial misconduct in the State's rebuttal closing denied defendant a fair trial.(1) Jury Instruction Defining "Delivery"

On appeal, defendant claims that the trial court erred by giving the third paragraph of IPI Criminal 4th 17.05A which specifies that a drug "delivery" does not require a transfer of money or consideration.

20

No. 1-08-0194

The User's Guide to the Illinois Pattern Jury Instructions explains that "[e]ach offense has at least two instructions: (1) a definitional instruction; and (2) a corresponding issues instruction." IPI Criminal 4th, User's Guide. In addition, the IPI Criminal 4th provides other types of instructions, such as those that "define a particular word or term." IPI Criminal 4th, User's Guide. It is this latter type of instruction, that defines a particular word or term, that is at issue in the case at bar.

The instruction at issue, IPI Criminal 4th 17.05A, provides a three-paragraph definition of the word "deliver." In the case at bar, the trial court gave only the third paragraph of the three-paragraph instruction. Both the State and the defense agree on appeal that the trial court was correct in not providing paragraphs one and two. However, the defense argues that the trial court erred in providing even paragraph three.

IPI Criminal 4th 17.05A is already quoted above, in its entirety, in the Background section of this opinion. As quoted earlier, the third paragraph states: "A delivery may occur with or without the transfer or exchange of money or with or without the transfer or exchange of other consideration."

Generally, a reviewing court will review jury instructions only for an abuse

21

of discretion. People v. Mohr, 228 Ill. 2d 59, 66 (2008). Although there must be some evidence in the record to justify giving a particular instruction, the decision whether or not to give it is within the sound discretion of the trial court. Mohr, 228 Ill. 2d at 65. The trial court has the discretion to decide whether the evidence in the record raises a particular issue and whether an instruction on that issue should be given. Mohr, 228 Ill. 2d at 65. "Although jury instructions are generally reviewed for an abuse of discretion, our standard of review is de novo when the question is whether the applicable law was accurately conveyed." Barth v. State Farm & Casualty Co., 228 Ill. 2d 163, 170 (2008).

The defense claims, first, that this instruction was inapplicable to the evidence since, as the committee note states, "the delivery in question was an actual physical transfer of possession, no definition of the term need be given to the jury." The defense claims, second, that even if the committee note provided the trial court with the discretion to give paragraph 3, providing the paragraph minimized the State's burden of proof, by giving the jury the impression that the State did not have to prove a purchase.

The defense does not cite any case law to support its first argument that the committee note prohibited the trial court from providing paragraph three. Rosier

No. 1-08-0194

v. Cascade Mountain, Inc., 367 Ill. App. 3d. 559, 568 (2006) (by failing to offer supporting legal authority or "any reasoned argument," plaintiffs waived consideration of their argument); People v. Ward, 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority ... is therefore forfeited."); In re Marriage of Bates, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited."); Ferguson v. Berger, 302 Ill. App. 3d 61 (1998) ("it is not necessary to decide this question since the defendant has waived the issue" by failing to offer case citation or other support as Supreme Court Rule 341 requires); 210 Ill. 2d R. 341 (h)(7) (argument in appellate brief must be supported by citation to legal authority and factual record).

This is not surprising, since the defense's argument misreads the note. The note states that, in the case of an "actual physical transfer," no definition "need be given." The American Heritage Dictionary states that, as a verb, the word "need" means "to be under the necessity of or the obligation to." American Heritage Dictionary, Second College Edition 835 (1985) (hereinafter American Heritage). In its detailed "Usage" section following the word "need," the dictionary explains that "'you needn't come' means 'you are under no obligation to come.' "

23

American Heritage 835. Thus, the negative form, which is used in the note, means that, while the trial court was under "no obligation" to give the instruction, it was not prohibited either. American Heritage 835.

If there was any doubt that the committee note provided the trial court with the discretion to give paragraph three, that doubt was erased by the note's subsequent comment that "[p]aragraph (3) may be given when the Court believes it would help the jury understand the issue." IPI Criminal 4th No. 17.05A, Committee Note. Thus, the decision of whether to provide paragraph 3 was left to the sound discretion of the trial court, as are most decisions regarding whether to provide certain jury instructions. E.g. Mohr, 228 Ill. 2d at 65.

The defense's second argument misconstrues the law, and almost underscores the need for the instruction. The defense argues that the issue for the jury to resolve was whether a drug purchase took place, and thus the instruction minimized the state's burden of proof.

However, the State did not have to prove that a purchase took place. The indictment accused defendant of "unlawfully and knowingly possess[ing] with intent to deliver *** less than 1 gram of a substance" containing cocaine, "in violation of Chapter 720, Act 570, Section 401(D)." To prove a charge of

possession of a controlled substance with intent to deliver, the State must prove three elements: (1) the defendant's knowledge of the presence of narcotics; (2) the defendant's immediate possession or control of the narcotics; and (3) the defendant's intent to deliver the narcotics. People v. Sanchez, 388 Ill. App. 3d 467, 473 (2009); People v. Rivas, 302 Ill. App. 3d 421, 429 (1998). Section 401of the Illinois Controlled Substances Act provides that "it is unlawful for any person knowingly to manufacture or deliver, or possess with intent to manufacture or deliver, a controlled substance." 720 ILCS 570/401 (West 2006). In contrast to what the defense argues, the statute does not require a sale or purchase as an element of the offense.

The Act defines the words "deliver" and "delivery" as follows:

> " ' Deliver' or 'delivery' means the actual, constructive or attempted transfer of possession of a controlled substance, with or without consideration, whether or not there is an agency relationship." ILCS 570/102(h) (West 2006).

The words "with or without consideration" in the above definition make clear that a sale or purchase is not required for a "delivery." ILCS 570/102(h) (West 2006).

Thus, the words of the Act that define both the offense and the word "delivery" leave no doubt that a sale or purchase was not part of the State's burden of proof.

The defense claims in its appellate brief that the purpose of paragraph 3 is "to clarify that a delivery can occur between friends, as a gift, or in other non-traditional transfers of contraband." The defense makes this argument without any case support or other authority. The State could have just as easily argued that the purpose of this paragraph is to clarify that a delivery can occur, with or without recovery of the transferred consideration. The purpose of paragraph 3, of course, is to track the language of the Act which provides that a delivery occurs upon "the actual, constructive or attempted transfer of possession of a controlled substance, with or without consideration." ILCS 570/102(h) (West 2006). Thus, the State is not required to prove a transfer of consideration in any case, whether the delivery occurs between best friends or complete strangers.

For these reasons, we hold that the trial court was not prohibited from providing paragraph 3 of the jury instruction, in a case of actual physical transfer; and that the instruction's accurate statement of the law did not minimize the

No. 1-08-0194

state's burden of proof.[4]   Thus, we find that the trial court did not abuse its discretion by providing paragraph 3.

(2) <u>Police Radio Messages</u>

On appeal, the defense claims that the trial court erred by allowing police officers to testify, over the defense's hearsay objection, about the contents of radio messages received from other officers.

The officers, who were the declarants of the radio messages, were all witnesses at trial; they testified about the content of their own statements, and were subject to cross-examination about them.  Thus, the defendant has not raised on appeal any claims concerning his Sixth Amendment right to confront and cross-examine the witnesses against him.  U.S. Const., amend. VI; <u>People v. Spicer</u>, 379 Ill. App. 3d 441, 449 (2008) (discussing the differences between "[h]earsay analysis and sixth amendment analysis").

Defendant's claim on appeal concerns solely an alleged violation of the rule against hearsay.  Hearsay is a statement that is offered to prove the truth of

---

[4]In his appellate reply brief, the defendant states that he "has never challenged that this [paragraph 3] was an incorrect statement of law."

27

the matter asserted, made by the declarant at a time when he or she was not testifying at trial. People v. Dunmore, 389 Ill. App. 3d 1095, 1106 (2009); Spicer, 379 Ill. App. 3d at 449; Federal Rules of Evidence 801(c). The rule against hearsay generally prevents the admission of hearsay statements in evidence at trial. Spicer, 379 Ill. App. 3d at 449. However, the rule has many exceptions. Spicer, 379 Ill. App. 3d at 449. In considering a hearsay objection, a court must decide, first, whether the statement is, in fact, hearsay. E.g. Dunmore, 389 Ill. App. 3d at 1106. If the statement is hearsay, the court must decide, second, if it is still admissible under one of the many exceptions. E.g. Spicer, 379 Ill. App. 3d at 449-50.

An appellate court will apply an abuse-of-discretion standard of review, to these two decisions by the trial court. The trial court has discretion in deciding whether statements were, in fact, hearsay; and if they were, whether they were still admissible under an exception to the hearsay rule. Dunmore, 389 Ill. App. 3d at 1106 (applying an abuse-of-discretion standard to a trial court's ruling that a statement was hearsay and that it did not qualify under an exception); Spicer, 379 Ill. App. 3d at 450 (applying an abuse-of-discretion standard to a trial court's ruling that a hearsay statement was admissible as an exception). Hearsay rulings

by a trial court are similar to other evidentiary rulings, which are generally reversed only for an abuse of discretion. Dunmore, 389 Ill. App. 3d at 1105. A trial court's decision is considered an abuse of discretion only when the decision is arbitrary, fanciful or unreasonable; or where no reasonable person would take the view adopted by the trial court. Dunmore, 389 Ill. App. 3d at 1105.

Defendant's objection is not to the admission of the information contained in the radio messages, but to the recounting of the messages by the officers who heard them. On appeal, defendant does not object to the testimony by police officers concerning the content of the radio messages that they voiced, but rather objects only to the corroborating testimony by the officers who heard the messages.

On appeal, defendant notes seven places in the trial testimony where receiving officers testified about the content of radio message that they had heard. The seven messages are summarized in the following chart. In the chart, Officer Srisuth is identified as the "Buy Officer," Officer Di Franco is identified as the "Surveillance Officer," and Detective Smith is identified as the "Enforcement Officer."

No. 1-08-0194

Summary of Radio Messages:

| | Testifying Witness | Declarant | Timing of Message | Substance of Radio Message |
|---|---|---|---|---|
| 1. | Buy Officer | Surveillance Offficer | Prior to controlled buy. | Description & location of seller. |
| 2. | Enforcement Officer | Buy Officer | After controlled buy. | Confirmation of controlled buy; description & location of seller. |
| 3. | Surveillance Officer | Buy Officer | After controlled buy. | Confirmation of controlled buy. |
| 4. | Enforcement Officer | Surveillance Officer | After controlled buy. | Confirmation of controlled buy; observation of a subsequent transaction; location of seller. |

| 5. | Enforcement Officer | Surveillance Officer | After detention. | Confirmation that correct individual detained. |
|---|---|---|---|---|
| 6. | Enforcement Officer | Buy Officer | After detention | Confirmation that correct individual detained. |
| 7. | Surveillance Officer | Buy Officer | After detention. | Confirmation that correct individual detained. |

For two of the seven statements listed above, defense counsel failed to object at trial. The statements that occurred without objection were statements (3) and (6), above. The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." People v. Woods, 214 Ill. 2d 455, 470 (2005); People v. Piatkowski, 225 Ill. 2d 551, 564 (2007). When a defendant has failed to preserve an error for review, we may still review for plain error. Piatkowski, 225 Ill. 2d at 562-63; 134 Ill. 2d R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). Since the defendant did raise this issue in his posttrial motion, the plain error doctrine applies only to statements (3) and (6), but not to the other statements.

31

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threaten[s] to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." Piatkowski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471. However, before we reach the issue of plain error, we must first determine whether any error occurred at all. People v. Walker, 392 Ill. App. 3d 277, 294 (2009) ("[i]n a plain error analysis, 'the first step' for a reviewing court is to determine whether any error at all occurred"). Since we find, for the reasons discussed below, that no error occurred, we do not need to perform a plain error analysis.

In the case at bar, the trial court overruled defendant's hearsay objections without identifying the basis of its ruling. Thus the trial court did not specifically find whether the testimony was hearsay, or, if it was, what exception applied. Since we may affirm a trial court's ruling on any basis supported in the record, we will examine first whether the testimony was, in fact, hearsay. People v. Dinelli,

32

No. 1-08-0194

207 Ill. 2d 387, 403 (2005) ("we may affirm the circuit court on any basis supported by the record").

A statement offered for some reason, other than for the truth of the matter asserted, is generally admissible because it is not hearsay. Dunmore, 389 Ill. App. 3d at 1106. For example, if a statement is offered to prove its effect on the listener's state of mind, or to show why the listener subsequently acted as he or she did, then the statement is not hearsay. Dunmore, 389 Ill. App. 3d at 1106. Therefore, if a statement is offered, not for the truth of the matter asserted in its contents, but to explain the actions or steps that a police officer subsequently took during the course of an investigation, than the statement is not hearsay. People v. Jura, 352 Ill. App. 3d 1080, 1086 (2004); People v. Edgecomb, 317 Ill. App. 3d 615, 627 (2000); People v. Warlick, 302 Ill. App. 3d 595, 598-99 (1998).

Defendant cites several successful hearsay challenges to police radio messages, where this court held that the trial court had erred by admitting the messages. For example, in Jura, the trial court erred by admitting testimony by three officers, in a gun possession case, that a police radio broadcast had provided the location and description of a person with a gun, and that defendant's location and description matched it. Jura, 352 Ill. App. 3d at 1086-87 (1st Dist.) (we

33

reversed on grounds of both hearsay and ineffective assistance of counsel). In Edgecomb, the trial court erred in admitting an officer's testimony about a radio call that a vehicle's occupants had fled after a vehicle stop; that the police apprehended one occupant (who later became the defendant); and that the vehicle matched the description of the getaway vehicle in an armed robbery. Edgecomb, 317 Ill. App. 3d at 627 (1st Dist.) (we reversed and remanded on other grounds). In Warlick, the trial court erred in admitting an officer's testimony that he had received a radio call about "a burglary in progress," when the sole defense at trial was that defendant had been seeking shelter, not to burglarize. Warlick, 302 Ill. App. 3d at 600-01 (1st Dist.) (however, we held that the error was harmless). Compare with People v. Townsend, 275 Ill. App. 3d 200, 203, 206 (1st Dist. 1995) (a police radio dispatch about an "armed robbery in progress" was admissible, where the issue at trial was whether defendant had committed the robbery, not whether a robbery had occurred.).

However Jura, Edgecomb, and Warlick differ from the case at bar because, in these cases, (1) the declarant did not testify; (2) the only evidence of the contents of the message was the testimony of the receiving officer; and (3) the testimony thus affected defendant's sixth amendment right to confront the

witnesses against him.  By contrast, in the case at bar, (1) the declarant did testify and was subject to cross-examination; (2) the events described in the radio messages were received into evidence from the officers who had witnessed the events first-hand; and (3) the sixth amendment is not at issue.

Despite these differences, defendant's cited cases are close enough in substance to shed some light on our issue.   In all three cases, we found that the State was using the investigative procedure as a means to place substantive information in front of the jury.  Edgecombe, 317 Ill. App. 3d at 627 ("[t]he State may not use the limited investigatory exception to place into evidence the substance of any out-of-court statement"); Jura, 352 Ill. App. 3d at 1088-89 (the hearsay was used as substantive evidence to prove "the very essence of the dispute: whether the defendant was the man who possessed the gun"); Warlick, 302 Ill. App. 3d at 600-01 ("a serious issue in the case was whether a burglary in fact was taking place" and the unidentified declarant in the radio call stated that a "burglary [was] in progress").

By contrast, in the case at bar, the State was not using the investigative procedure as a means to place substantive information in front of the jury.   The State used the declarants themselves as the means of placing in front of the jury

35

what they had personally done and observed. The purpose of having other officers recount what they heard over the radio was to explain why the receiving officers then took the actions that they did. For example, the buy officer needed to explain that he was prompted to approach this individual at this location, by information received from the surveillance officer. The enforcement officer needed to explain that it was the confirmation of a controlled buy from both the buy and surveillance officers that led to his detention of the individual described. The three officers and trial witnesses were acting in unison, almost like the arm and legs of one organism, linked at its nerve center by the radio calls. Their actions and reactions only make sense, when viewed in relation to one another. Thus, the radio calls had the non-hearsay purpose of establishing their effect on the listener, rather than being admitted for the truth of the matter asserted. The matters asserted were admitted for their truth through the individuals who were showing what they had actually observed or how they acted in the manner that they did.

The case at bar is more factually similar to Rivas than the cases cited by defendant. Rivas, 302 Ill. App. 3d at 430-31. The Rivas case, like the case at bar, involved a controlled buy where defendant was subsequently charged with drug

delivery. <u>Rivas</u>, 302 Ill. App. 3d at 424, 427. The <u>Rivas</u> case, like the case at bar, concerned testimony by an enforcement officer about the contents of a radio call from a surveillance officer, which led the enforcement officer to arrest the defendant. <u>Rivas</u>, 302 Ill. App. 3d at 431. In <u>Rivas</u>, we held that the trial court did not err by admitting the enforcement officer's testimony that he made the arrest after receiving a radio call from the surveillance officer that the suspect had driven to a location, carried a package into an office, and was driving away. <u>Rivas</u>, 302 Ill. App. 3d at 430-31 (1st Dist.). In <u>Rivas</u>, as in the case at bar, the surveillance officer testified at trial, and the statement was needed to explain why the enforcement officer subsequently acted to arrest the suspect. <u>Rivas</u>, 302 Ill. App. 3d at 427, 431. In <u>Rivas</u>, as in the case at bar, we found no error. <u>Rivas</u>, 302 Ill. App. 3d at 431. See also <u>Townsend</u>, 275 Ill. App. 3d at 203, 206 (a police radio dispatch about an "armed robbery in progress" was admissible to explain "the reason and manner in which the police conducted their investigation").

For these reasons, we find that, under the circumstances of this case, the statements were not hearsay; and the trial court did not abuse its discretion by admitting them. Even if we found an abuse of discretion, any error was harmless, for the reasons explained below, in section 3(g) of this opinion.

No. 1-08-0194

### (3) Illinois Supreme Court Rule 431(b)

Defendant seeks a new trial, because the trial court failed to question potential jurors about their understanding and acceptance of certain principles of law, as required by the amended Illinois Supreme Court Rule 431(b).  Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007) (2007 version).

Although supreme court rules are not statutes, they have "the force of law, and the presumption must be that they will be obeyed and enforced as written." Robidoux v. Oliphant, 201 Ill. 2d 324, 332 (2002), quoting Bright v. Dicke, 166 Ill. 2d 204, 210 (1995).  When we review issues concerning the interpretation of a supreme court rule, we apply a de novo standard of review. People v. Reed, 376 Ill. App. 3d 121, 125 (2007).

### (a) History of Rule 431(b): The Four Questions

The rule at issue, Illinois Supreme Court Rule 431(b), is a codification of the Illinois Supreme Court's holding in People v. Zehr, 103 Ill. 2d 472, 477 (1984). In Zehr, our supreme court held that a trial court erred during voir dire, when it refused the defense counsel's request to ask potential jurors about four fundamental principles of law.  Zehr, 103 Ill. 2d at 476-78.  In Zehr, our supreme

38

court held that it is "essential to the qualification of jurors in a criminal case ... that they know" these four fundamental principles: "[(1)] that defendant is presumed innocent; [(2)] that defendant was not required to produce any evidence on his own; [(3)] that defendant must be proved guilty beyond a reasonable doubt; and [(4)] that defendant's failure to testify on his own behalf could not be held against him." Zehr, 103 Ill. 2d at 477. These four principles are now commonly known as the "Zehr principles." People v. Jocko, 389 Ill. App. 3d 247, 259 (2009); People v. Martinez, 386 Ill. Ap. 3d 153, 158 (2008); People v. Gilbert, 379 Ill. App. 3d 106, 109 (2008); People v. Yarbor, 383 Ill. App. 3d 676, 681 (2008).

To ensure compliance with its 1984 Zehr decision, our supreme court amended Rule 431 twice, first in 1997 and then again ten years later in 2007. In 1997, the supreme court amended Rule 431to provide that, if requested by defendant, the trial court must ask potential jurors whether they understood and accepted the Zehr principles. 177 Ill. 2d R. 431, Committee Comments, at 1xxix. According to the accompanying committee notes, the 1997 amendment sought to "end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the

law." 177 Ill. 2d R. 431, Committee Comments, at 1xxix.

The 1997 version of Supreme Court Rule 431(b)stated, in full:

"(b) <u>If requested by the defendant,</u> the court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section."

No. 1-08-0194

(Emphasis added) 177 Ill. 2d R. 431(b) (1997 version).

This court has held that the 1997 version of Rule 431(b), as quoted above, did not require the trial court to ask about the <u>Zehr</u> principles, unless defense counsel asked the trial court to do so. <u>Jocko</u>, 389 Ill. App. 3d at 260; <u>Gilbert</u>, 379 Ill. App. 3d at 109-10, citing <u>People v. Williams</u>, 368 Ill. App. 3d 616, 623 (2006) and <u>People v. Foreman</u>, 361 Ill. App. 3d 136, 146 (2005); <u>Martinez</u>, 386 Ill. App. 3d at 160-61.

In 2007, our supreme court amended the rule again. The 2007 amendment deleted the first five words: "If requested by the defendant." Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431 (b), eff. May 1, 2007). This deletion had the effect of requiring the trial court to ask about the four <u>Zehr</u> principles, whether or not the defendant had made the request.

The 2007 version of Rule 431(b), which is still in effect, states:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted, the State must prove the defendant guilty beyond a

41

reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her, however no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007 (2007 version).

### (b) The Trial Court's Error

There is no question that, in the case at bar, the trial court erred. The 2007 version applied to the case at bar, and the trial court failed to implement the changed version. Since defendant's trial began on August 28, 2007, and since the 2007 version of Rule 431(b) took effect several months earlier on May 1, 2007, the 2007 version applied to the case at bar. Although the new version applied, the trial court failed to ask potential jurors during voir dire whether they understood and accepted the Zehr principles, as the 2007 version required.

There is no dispute between the parties that the trial court erred when it

failed to question the potential jurors about the four <u>Zehr</u> principles listed in Rule 431(b). The dispute between the parties is: whether this error was so fundamental to the integrity of the justice system that it requires automatic reversal; or whether we may affirm if we find that the error was harmless, in the context of defendant's trial and the evidence presented against him.

### (c) Plain Error Doctrine

Since defendant did not object at trial or raise this issue in his posttrial motion, we review the issue under the plain-error doctrine.

As noted above, the Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." <u>Woods</u>, 214 Ill. 2d at 470; <u>Piatkowski,</u> 225 Ill. 2d at 564. When a defendant has failed to preserve an error for review, we may still review for plain error. <u>Piatkowski</u>, 225 Ill. 2d at 562-63; 134 Ill. 2d R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). In the case at bar, defendant did not object at trial or raise this issue in his posttrial

motion.[5]  Defendant's appellate brief conceded that "defense counsel did not object to the defendant's failure to comply with Rule 431(b)."

However, defendant claims that he did not waive the issue for appeal, because: (1) requiring defense counsel to object would negate the effect of the 2007 amendment which obligated the trial court to ask the four questions sua sponte; and (2) the waiver rules are relaxed when the objection is directed to the trial judge's conduct.  The Illinois Supreme Court has held that "[a]pplication of the waiver rule *** is less rigid where the basis for the objection is the circuit court's conduct."  People v. Davis, 185 Ill. 2d 317, 343 (1998); People v. Williams, 173 Ill. 2d 48, 85 (1996).

First, requiring defense counsel to object to preserve the error for appeal would not negate the mandatory nature of the 2007 amendment.  Trial judges are presumed to follow the law, and we assume that the mandatory nature of the 2007 amendment will be followed.  In addition, we apply the plain error doctrine to

---

[5]In his posttrial motion, defendant raised boilerplate claims such as a denial of due process and equal protection, and the state's failure to prove guilt beyond a reasonable doubt.  The claims specific to defendant's case were that the trial court "erred in giving instructions on behalf of the State over the Defendant's objection" and "erred by allowing Chicago Police Officers to testify to the content of their radio transmissions, thereby allowing the jury to hear impermissible hearsay evidence."

other situations where actions are mandatory, and we have not been presented with a reason to carve out an exception for this issue alone. E.g. People v. Lewis, 234 Ill. 2d 32, 39-42 (2009) (absent "exceptional circumstances," the plain error doctrine will be applied even though the trial court failed to follow a statutorily-mandated procedure).

Second, the typical reason for relaxing the waiver rule does not apply to this case. "The reason for relaxing the waiver rule is that the objection would have fallen on deaf ears." People v. Davis, 378 Ill. App. 3d 1, 10 (2007). For example, our supreme court relaxed the waiver rule when the trial judge refused to consider mitigating evidence at the defendant's death penalty hearing (Davis, 185 Ill. 2d at 343) or refused to allow defense counsel to participate in formulating a response to a jury's note (Williams, 173 Ill. 2d at 85) or spontaneously informed the venire at defendant's second death penalty hearing that a prior jury had imposed the death penalty (People v. Woolley, 205 Ill. 2d 296, 301-02 (2002)). Similarly, we relaxed the waiver rule when the trial judge interrupted the defendant's testimony to offer unsolicited advice about his decision to testify. People v. Vaughn, 354 Ill. App. 3d 917, 920-21 (1st Dist. 2004).

In the case at bar, there was no reason to find that an objection would have fallen on deaf ears. Quite the contrary is true, considering that the questions were mandatory. Defendant's failure to object at trial robbed the trial court of the opportunity to correct the error; and defendant's failure to object in a posttrial motion deprived a reviewing court of any factual findings which the trial court might have made concerning the credibility of the witnesses and their contribution to the weight of the evidence against defendant, and thus the possible harmlessness of the error. Davis, 378 Ill. App. 3d at 10-11. "Since there is no reason to think that a request from counsel would have fallen on deaf ears, the relaxed waiver rule does not apply in this case. As a result, this court will review for plain error only." Davis, 378 Ill. App. 3d at 10-11.

Recently, the Third District of this court considered this same waiver issue and reached the same conclusion that we do, holding: "[a]lthough our supreme court elected to place the duty squarely on the shoulders of the court to comply with the directive command in the current Supreme Court Rule 431(b), the amended rule does not alleviate *** counsel of the defense of an obligation to object when a trial judge inadvertently overlooks the applicability of Rule 431(b)." People v. Russell, No. 3-08-0051, slip op. at 16 (November 18, 2009).

No. 1-08-0194

Thus, we now proceed with plain-error review.

As noted above, "the plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threaten[s] to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." Piatkowski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471. With a plain error analysis, "it is the defendant who bears the burden of persuasion with respect to prejudice." Woods, 214 Ill. 2d at 471.

In the case at bar, defendant claims that the error was so serious that it "challenged the integrity of the judicial process" and thus reversal is required under the second prong; and that reversal is also required under the first prong due to the closeness of the evidence. The State claims that the error was not fundamental, and thus reversal is not required under the second prong; and that reversal is also not required under the first prong, since the evidence against defendant was overwhelming. For the reasons discussed below, we find that the

47

error was not so fundamental as to require reversal under the first prong of the plain error analysis.

### (d) Prior Appellate Court Opinions

A number of appellate panels before us have already ruled on the question of whether the failure to ask the four Zehr questions rises to the level of a fundamental error.[6] There were four opinions filed between approximately Thanksgiving and Christmas 2009, alone. According to the Shepard's service, one opinion was "submitted" on May 6, 2009, "filed" on November 24, 2009, "amended" on December 4, 2009, and "filed" again on December 7, 2009. The

---

[6]Several appellate court opinions that cite Rule 431(b) are not included in our summary because they concern different questions. People v. Belknap, No. 3-08-0692 (November 18, 2009); People v. Vargas, No. 1-08-0383 (November 20, 2009). First, although Belknap was decided on the basis of Rule 431(b), it did not consider whether the failure to ask the four Zehr questions was a fundamental or structural error, requiring automatic reversal. Instead, the Belknap court reversed under the first prong of the plain error doctrine, after finding that the trial court's failure to ask was error, and that the evidence was closely balanced. The Belknap court did not discuss the second prong of the plain error doctrine, and thus it never considered whether the failure to inquire about the four Zehr principles challenged the integrity of the judicial process. Second, Vargas did not concern a failure to inquire, but rather concerned the form that a proper inquiry should take. Third, our summary also does not include appellate court opinions that discussed either the prior version of Rule 431(b) or whether the 2007 amendment has retroactive application. E.g. People v. Schmidt. 392 Ill. App. 3d 689, 710 (2009); People v. Braboy, 393 Ill. App. 3d 101, 109 (2009).

No. 1-08-0194

following summary is complete only as of Christmas 2009.[7]

On September 30, 2009, our supreme court vacated four of the appellate opinions.[8] People v. Alexander, 233 Ill. 2d 565 (2009); People v. Anderson, 283 Ill. 2d 565 (2009); People v. Stump, 233 Ill. 2d 592 (2009); and People v. Matchem, 233 Ill. 2d 583 (2009). One of the four vacated opinions had found that the error was fundamental; and the remaining three had found that it was not. Compare People v. Anderson, 389 Ill. App. 3d 1, 5, 9 (1st Dist. 2009) (error was so "fundamental," that reversal was required under the second prong of the plain error analysis), with People v. Stump, 385 Ill. App. 3d 515, 522 (4th Dist. 2008) ("the error was harmless because (1) all four Zehr principles were addressed to each juror at some point during voir dire, and (2) the evidence presented at trial against defendant was overwhelming.") and People v. Alexander, 391 Ill. App. 3d

---

[7]The concurrence and dissent in People v. Moore, decided two days before Christmas 2009, discuss Glasper, but not on a Zehr-related topic. For this reason, the Moore opinion is not included in our summary. People v. Moore, Docket No. 1-07-0410 (December 23, 2009).

[8]In addition to vacating the four opinions on September 30, 2009, our supreme court also vacated six orders from the Fourth District that were not published pursuant to Supreme Court Rule 23. People v. Bui, No. 4-07-0651 (February 23, 2009); People v. Dillard, No. 4-07-0977 (January 21, 2009); People v. Harris, No. 4-07-0821 (February 3, 2009); People v. Roberson, No. 4-07-0864 (February 18, 2009); People v. Williams, No. 4-07-0894 (September 26, 2008); People v. Wright, No. 4-07-0894 (September 26, 2008).

No. 1-08-0194

419, 433 (3d Dist. 2009) ("We cannot hold that the failure to follow a supreme court rule standing alone becomes a per se plain error."). See also People v. Matchem, No. 4-08-0554 (April 9, 2009) (simply followed Stump). Thus, our supreme court vacated opinions on both sides of the issue.

Although several opinions on this issue were not vacated, most of the intact opinions were based on the First District's opinion in Anderson, which was vacated. The intact opinions include, in chronological order: (1) People v. Graham, 393 Ill. App. 3d 268 (1st Dist., 1st Div., July 20, 2009); (2) People v. Wilmington, 394 Ill. App. 3d 567 (1st Dist., 4th Div. September 24, 2009); (3) People v. Blair, No. 2-07-0862 (2d Dist. September 29, 2009); (4) People v. Arredondo, 394 Ill. App. 3d 944 (1st Dist. October 8, 2009); (5) People v. Madrid, No. 1-08-0324 (1st Dist. October 8, 2009); (6) People v. Blanton, No. 4-08-0120 (4th Dist. November 10, 2009); and (7) People v. Russell, No. 3-08-0051 (3d Dist. November 18, 2009); (8) People v. Alexander, No. 3-07-0915 (3d Dist. November 30, 2007) (new opinion entered after the original opinion was vacated by the Illinois Supreme Court) (Alexander II); (9) People v. Ammerman, No. 3-08-0071 (3d Dist. December 7, 2009); and (10) People v. Magallanes, No. 1-07-

No. 1-08-0194

2826 (1st Dist. December 23, 2009). [9]

For the first six opinions, their foundation is the now vacated <u>Anderson</u>.

<u>Graham</u>'s three-justice panel included two of the same panel members as the

vacated <u>Anderson</u>, including <u>Anderson</u>'s authoring justice.  Not surprisingly,

<u>Graham</u> simply adopted <u>Anderson</u>, holding: "Our supreme court has yet to

construe the 2007 version of Rule 431(b) at issue in this case.  Until that time, we

shall continue to follow Anderson ***."   <u>Graham</u>, 393 Ill. App. 3d at 276.  In

<u>Wilmington</u>, the First District's next opinion on the subject, we found our prior

opinions in <u>Anderson</u> and <u>Graham</u> "more soundly reasoned" than the decisions by

other districts in <u>Stump</u> and <u>Alexander</u>, also now vacated.  <u>Wilmington</u>, 394 Ill.

App. 3d at 575.  In <u>Blair</u>, the Second District decided to join "the trend of

authority" established by us in cases such as <u>Anderson</u> and <u>Graham</u>.  Blair, No. 2-

07-0862, slip op. at 22.  In <u>Arredondo</u> and <u>Madrid</u>, two First District cases

decided on the same day, we held that we "continue[d] to adhere to the well-

reasoned decisions in <u>Anderson</u> and <u>Graham</u>."  <u>Arredondo</u>, 394 Ill. App. 3d at

955; <u>Madrid</u>, No. 1-08-0324, slip op. at 15 (same quote in both opinions).

---

[9]For the reasons discussed in footnote 10, <u>People v. Owen</u>, 394 Ill. App. 3d
147 (2009) is not included in our list.

No. 1-08-0194

The sixth opinion, Blanton, was first filed on June 17, 2009, and then withdrawn, and then refiled on November 10, 2009 without reference to the vacated opinions, but with the same result.  Although the refiled Blanton opinion eliminated all explicit citations to Anderson, it still relied on opinions that were built on Anderson, namely the five opinions  discussed above:  (1) Graham, 393 Ill. App. 3d at 276; (2) Wilmington, 394 Ill. App. 3d at 575;  (3) Blair, No. 2-07-0862; (4) Arredondo, 394 Ill. App. 3d at 955; (5) Madrid, No. 1-08-0324.  See Blanton, No. 4-08-0120.  Thus, even seemingly intact appellate opinions fell like a house of cards, after our supreme court removed the bottom one:, namely Anderson.

Of the ten intact appellate opinions listed above, only the most recent ones, which are the last four listed, are not based on Anderson.  Russell, No. 3-08-0051. For example, in reaching its holding, the Third District in Russell did not cite Anderson, or any of the opinions based on Anderson, or any of the other vacated opinions. Russell, No. 3-08-0051.  Relying almost exclusively on Glasper, the Third District in Russell held that the error was not a per se violation requiring "automatic reversal."  Russell, No. 3-08-0051, slip op. at 18.

The other three most recent appellate opinions, analyzing Glasper, also

agree with <u>Russell</u> that this type of error is not a <u>per se</u> violation. <u>Accord</u> <u>Magallanes</u>, No. 1-07-2826, slip op. at 37 (1st Dist. December 23, 2009) ( "The holding in <u>Glasper</u> also compels us to reject defendant's argument that Rule 403(b)(4) errors are automatically reversible."); <u>Ammerman</u>, No. 3-08-0071, slip op. at 13 (3d Dist. December 7, 2009) ("considering <u>Glasper</u>, we hold that the trial court in this case did not commit plain error under either prong of the rule"); <u>Alexander</u> II, No. 3-07-0915, slip op. at 20 (3d Dist. November 30, 2009) (based upon <u>Glasper</u>, appellate court found that the trial court's failure to question the venire about the <u>Zehr</u> principles "did not render the defendant's trial fundamentally unfair").

The supreme court's September 30 order had the effect of leaving us with only a few points of intact authority: (1) our supreme court's recent decision in <u>People v. Glasper</u>; 234 Ill. 2d 173 (June 18, 2009); (2) the 2007 amendment itself; and (3) the four most recent appellate decisions discussing <u>Glasper</u>,[10] which have

---

[10]We do not include <u>Owens</u> in our list because, even though it was decided months after <u>Glasper</u>, it did not discuss, or make any reference at all, to this controlling supreme court opinion. <u>Owens</u>, 384 Ill. App. 3d, 148-155 (not a single cite to <u>Glasper</u>). In addition, the Fourth District in <u>Owens</u> took a hybrid approach. It affirmed its prior opinion in <u>Stump</u> (later vacated) that had applied a harmless error analysis. However, it held that, on "the record here," the failure to inquire about the four <u>Zehr</u> principles challenged the integrity of the judicial process.

No. 1-08-0194

all held that this type of error is not a per se violation. Magallanes, No. 1-07-2826, slip op. at 28-29 (1ˢᵗ Dist. December 23, 2009); Ammerman, No. 3-08-0071, slip op. at 13 (3d Dist. December 7, 2009); Alexander II, No. 3-07-0915, slip op. at 20 (3d Dist. November 30, 2009); Russell, No. 3-08-0051, slip op. at 17-19 (3d Dist. November 18, 2009).

When our supreme court vacated four of the appellate opinions on this issue, it directed the appellate court "to reconsider its judgement in light of People v. Glasper" and we will do just that. E.g. People v. Alexander, No. 108562 (September 30, 2009) ("The appellate court is directed to reconsider its judgment in light of People v. Glasper *** to determine if a different result is warranted.").

(e) Supreme Court's Decision in Glasper

In Glasper, the Illinois Supreme Court was faced with an issue which is almost identical to the issue that we face here: what to do with a trial court's failure to ask a question required by Supreme Court Rule 431(b). Glasper, 234 Ill. 2d at 189. In Glasper, our supreme court answered that question by holding

_____

Thus, Owens did not hold either (1) that the failure to inquire was a per se violation requiring automatic reversal or (2) that harmless error analysis always applied. Owens, 384 Ill. App. 3d at 152-54.

that the failure was not a fundamental error, and that a harmless error analysis applied. Glasper, 234 Ill.. 2d at 199-200. Following the precedent set by our supreme court, we reach the same holding.

In Glasper, the rule at issue was the 1997 version of Rule 431(b), which required the trial court to ask about the Zehr principles, only if the defense counsel requested an inquiry. Glasper, 234 Ill. 2d at 187. In Glasper, the defense counsel did make the request, making the result the same as it is in the case at bar, namely that the trial court was required to ask. Glasper, 234 Ill. 2d at 189 ("once a defendant ma[de] a request, the decision to question the venire" became " a requirement").

Faced with the failure to ask a required question, our supreme court held that this error did "not rise to the level of structural error." Glasper, 234 Ill. 2d at 199. Our supreme court "decline[d] to find that a violation of Rule 431(b) is per se reversible." Glasper, 234 Ill. 2d at 200. Instead our supreme court held that the error did "not require automatic reversal" and that it was "amenable to harmless error review." Glasper, 234 Ill. 2d at 200. In support of its holding, our supreme court observed the questioning set forth in Rule 431(b) was "not uniformly required in other state and federal jurisdictions. Glasper, 234 Ill. 2d at

No. 1-08-0194

198.

Of course, Glasper is not completely identical to our case. Glasper concerned the 1997 version of the rule, and our supreme court was careful to limit its holding to the version of the rule at that point in time. Glasper, 234 Ill. 2d at 200. Even with this difference in mind, we find that Glasper dictates the holding in the case at bar. The 2007 amendment merely increased what fell under the scope of mandatory; and our supreme court in Glasper already answered what happens when there is a violation of what is mandatory under the rule, and what happens is a harmless error analysis. Glasper, 234 Ill. 2d at 199- 200.

This conclusion is consistent not only with Glasper, but also with other supreme court precedent. As our supreme court stated in Glasper, "[i]t would be inconsistent for this court to hold that a trial court's failure to question a venire regarding a defendant's decision not to testify in violation of Rule 431(b) requires automatic reversal, when we have repeatedly held that automatic reversal is not required when a prosecutor mentions a defendant's post-Miranda silence and commits a Doyle violation. Glasper, 234 Ill. 2d at 198, discussing Doyle v. Ohio, 426 U.S. 610, 619, 49 L.Ed. 2d 91, 98, 96 S.Ct. 2240, 2245 (1976) (U.S. Supreme Court held that the prosecution's use of a defendant's post-Miranda silence for

56

impeachment purposes is generally a due process violation). See People v. Dameron, 196 Ill. 2d 156, 164-68 (2001) (citing cases where the Illinois Supreme Court concluded that a Doyle violation amounted to harmless error).

Thus, Glasper and other supreme court precedent compel us to find that the error was not a fundamental or structural error.

### (f) 2007 Amendment

Our conclusion is supported not only by Glasper and by other supreme court precedent, but also by the 2007 amendment itself.

In Glasper, the dissent claimed that the majority opinion "renders this court's 2007 amendment of Rule 431(b) nonsensical." Glasper, 234 Ill. 2d at 230. In other words, there was no point in changing the rule from discretionary to mandatory, if its violation will usually found to be harmless error. Since the trial court will provide the same information to the jury at the end of trial, the jury instructions will contribute to a harmless error finding. C.f. Glasper, 234 Ill. 2d at 201 ("citizens sworn as jurors" are presumed to follow "the jury instructions given to them"). In addition, the majority in Glasper held that Rule 431(b)(4) questioning was not "indispensable to a fair trial." Glasper, 234 Ill. 2d at 196. If a failure to ask will be found to be harmless error in most cases, then one could

argue that the change from discretionary to mandatory was without any real effect. Since we must interpret all rules to have effect, a lack of effect would render the amendment "nonsensical." Glasper, 234 Ill. 2d at 230.

First and foremost, the reason why the change has a real or substantive effect is that trial judges are presumed to follow the law. If we presume that jurors will follow jury instructions, we must also presume that trial courts will follow Supreme Court Rules. Glasper, 234 Ill. 2d at 201 ("citizens sworn as jurors" are presumed to follow "the jury instructions given to them"). The effect of the 2007 amendment was to change the inquiry from discretionary unless defense counsel requested it, to mandatory at all times. This change took the impetus for the questions from defense counsel alone and placed it "squarely on the shoulders" of all the attorneys in the courtroom: the trial judge, prosecutor, and defense counsel. Russell, No. 3-08-0051, slip op. at 16 (effect of the 2007 amendment was to "place the duty squarely on the shoulders of the court" to inquire, and to encourage both counsel to object). Now the trial judge has the responsibility to ask, and the prosecutor has an incentive to see that the judge does.

In most of the appellate cases discussed above, the trial court's error

occurred in the months immediately after the 2007 amendment. For example, in the now vacated <u>Anderson</u>, we observed that the new rule "went into effect on May 1, 2007," and jury selection began just "three weeks later, on May 21, 2007." <u>Anderson</u>, 389 Ill. App. 3d at 2. In the now vacated <u>Stump</u>, the jury trial began just six days after the new rule took effect. <u>Stump</u>, 385 Ill. App. 3d at 517 (trial began on May 7, 2007). See also <u>Blair</u>, No. 2-07-0862, slip op. at 2 ("Jury selection commenced on June 11, 2007."); <u>Wilmington</u>, 394 Ill. App. 3d at 570 ("defendant's trial occurred in July 2007"); <u>Alexander</u>, 391 Ill. App. 3d at 421 (vacated) ("defendant's trial began on October 1, 2007"); <u>Russell</u>, No. 3-08-0051, slip op. at 2 (trial began October 2, 2007).[11] The rule had stayed the same for a decade, and these early months marked an adjustment period, which is unlikely to be repeated.

Second, prosecutors now have an incentive to remind trial judges who may forget. A prosecution of a crime is the culmination of a lot of hard work. For example, in the case at bar, three police officers placed themselves at risk on the

---

[11] Several of the opinions stated the offense date but not the trial date. <u>Arredondo</u>, 394 Ill. App. 3d at 945 (the offense occurred on June 3, 2006); <u>Graham</u>, 393 Ill. App. 3d at 269 (the offence occurred on September 28, 2006); <u>Madrid</u>, No. 1-08-0324, slip op. at 2-5 (the offense occurred in 2004).

street to clear a neighborhood of a crack dealer. No prosecutor wants to see an otherwise valid conviction tossed out because the trial court neglected to ask the four questions. As the Third District observed in <u>Russell</u>, "all parties and the judge must take care to insure" that the questions are now asked; and the incentive for the prosecutors is "equally serious" to the incentive for the defense counsel. <u>Russell</u>, No. 3-08-0051, slip op. at 16.

Third, a harmless error analysis is not toothless. On appeal, once the defendant establishes that an error was made, an appellate court is likely to reverse, unless the appellate record demonstrates that the evidence was "overwhelming" and the error was "harmless beyond a reasonable doubt." <u>Glasper</u>, 234 Ill. 2d at 202-03. Previously, if defense counsel neglected to ask at trial and the issue was appealed, an appellate court would find that there was no error at all and never even proceed to a harmless-error analysis. The difference is that, now, an appellate court is likely to reverse the conviction, if the evidence is not "overwhelming." <u>Glasper</u>, 234 Ill. 2d at 202-03.

For these reasons, we find that applying harmless error analysis to a violation of the 2007 amendment does not rob the amendment of its intended effect.

## (g) Harmless Error Analysis

In Glasper, our supreme court concluded that "the trial court's error was harmless beyond a reasonable doubt," because "[t]he evidence of defendant's guilt is overwhelming." Glasper, 234 Ill. 2d at 202-03. We reach the same conclusion here.

In the case at bar, the jury found defendant guilty of the delivery of a controlled substance. The evidence supporting the conviction was overwhelming. An undercover police officer testified that he purchased crack cocaine from defendant. A surveillance officer witnessed the undercover purchase, as well as two more additional transactions in the same location, where defendant exchanged small items for cash. A forensic chemist confirmed that the item purchased during the undercover buy was cocaine. No witnesses testified for the defense. Although the recorded ten-dollar bill used in the undercover purchase was not recovered from defendant, the surveillance officer testified that he observed defendant pull out an unknown amount of money from a wad of bills and hand it to a subsequent purchaser, when defendant was apparently making change.

In his argument against a harmless-error finding, defendant stated in his

appellate brief only that "[t]he evidence in this case turned on the credibility of the officers, and was thus close." However, defendant's brief offered no explanation of how the police officers' credibility had been discredited. Defendant cited in his support two cases: People v. Evans, 369 Ill. App. 3d 366 (4th Dist. 2006); and People v. Wilson, 199 Ill. App. 3d 792 (1st Dist. 1990). In both cases, the appellate court found the evidence closely balanced, where the conviction had forced the jurors to pick one competing witness over another. In Evans, the appellate court found that "the verdict was based primarily on a credibility determination of the competing theories testified to by the parties' respective experts." Evans, 369 Ill. App. 3d at 376. In Wilson, we court found that the verdict "rested on the jury's determination of the relative credibility of the victim" and a witness who had "testified that the victim had a motive to lie about the assault." Wilson, 199 Ill. App. 3d at 795. By contrast, in the case at bar, no competing witnesses testified at trial, and thus the jury was not asked to determine "relative credibility." Wilson, 199 Ill. App. 3d at 795. In the case at bar, the jurors were merely asked to assess the testimony of two police officers, who fully corroborated each other; and whose testimony was not called into question by a competing witness, cross-examination or other evidence. The need

for this assessment did not make the evidence "closely balanced." Evans, 369 Ill. App. 3d at 376. Wilson, 199 Ill. App. 3d at 795.

For the reasons discussed above, we find that reversal is not required under either prong of the plain error doctrine. First, the error was not "so closely balanced that the error alone threaten[ed] to tip the scales of justice against the defendant." Piatkoski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471. Second, the error was "not so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." Piatkoski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471.

### (4) Refusal to Rule on Defendant's Motion

Fourth, defendant claims that the trial court erred by refusing to rule, until after defendant testified, on defendant's motion in limine concerning the admissibility of his prior convictions for impeachment purposes. For the reasons discussed below, we find that defendant failed to preserve his objection to the trial court's refusal to rule.

Prior to trial, both the State and the defense filed motions concerning the admission of defendant's prior convictions if he testified. The trial court stated that it "would reserve ruling on this matter until the defendant has testified." On

63

appeal, defendant claims that, without knowing how the trial court would rule, he decided not to testify.

Defendant acknowledges on appeal that the Illinois Supreme Court recently addressed this same issue in People v. Patrick, 233 Ill. 2d 62 (2009) and that in Patrick, our supreme court held that a defendant, who does not testify, does not have the "right to appellate review of this issue." Patrick, 233 Ill. 2d at 79. Our supreme court clearly stated that "defendants must take the risk and present the testimony for the issue to be reviewable." Patrick, 233 Ill. 2d at 79. However, defendant's counsel asks us to find that our supreme court's holding is "erroneous." Obviously, defense counsel knows that a holding by our supreme court is binding on this court. Presumably, the defense presents this argument in order to preserve it, since our supreme court granted certiorari in a case where a defendant filed a similar motion but did not testify. People v. Averett, 231 Ill. 2d 671 (2009), granting petition for leave to appeal in People v. Averett, 381 Ill. App. 3d 1001, 1020 (2008) (holding that "defendant's failure to testify eliminates the circuit's refusal to rule as a reviewable issue"). As the defense is well aware, we must reject this argument, until and if such time that the supreme court rules differently.

## (5) State's Rebuttal Closing

Fifth, defendant claims that prosecutorial misconduct during the State's rebuttal closing denied defendant a fair trial. For the reasons stated below, we find that the prosecutor did not commit misconduct in the State's rebuttal closing argument, when she responded to remarks made during the defense closing.

## (a) Plain Error Review

Defendant failed to object to this issue both at trial and in his posttrial motion. At trial, defendant did not object once during either the State's initial closing argument or the State's rebuttal closing argument. In defendant's posttrial motion, defendant objected both to the jury instruction defining a delivery and to the admission of the police radio messages on hearsay grounds, but he did not raise any objections to the State's closing arguments.

As we already discussed above, to preserve an alleged trial error for appellate review, a defendant must both: (1) specifically object at trial; and (2) raise the specific issue again in a posttrial motion. Woods, 214 Ill. 2d at 470; Piatkowski, 225 Ill. 2d at 564. However, even when a defendant failed to preserve an error for review, an appellate court may still review for plain error. Piatkowski, 225 Ill. 2d at 562-63; 134 Ill. 2d R. 615(a). The plain error doctrine

permits an appellate court to reverse on the basis of unpreserved error if either: (1) the error was "clear or obvious," and the evidence at trial was so closely balanced that this error could have tipped the scales against the defendant; or (2) the unpreserved error was "so serious" that it challenged the integrity of the judicial process and the fairness of defendant's trial. Piatkowski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471. Before a reviewing court analyzes the two prongs of the plain error doctrine, our first step is to determine whether any error occurred at all. Walker, 392 Ill. App. 3d at 294. For the reasons discussed below, we find that no error occurred.

## (b) Standard of Review

It is not clear whether the appropriate standard of review for this issue is de novo or abuse of discretion. This court has previously made this same observation in both People v. Phillips, 392 Ill. App. 3d 243, 274-75 (2009) and People v. Johnson, 385 Ill. App. 3d 585, 603 (2008). The Second District recently agreed with our observation that the standard of review for closing remarks is an unsettled issue. People v. Robinson, 391 Ill. App. 3d 822, 839-40 (2009).

The confusion stems from an apparent conflict between two supreme court

No. 1-08-0194

cases: People v.Wheeler, 226 Ill. 2d 92, 121 (2007), and People v. Blue, 189 Ill. 2d 99, 128, 132 (2000). In Wheeler, our supreme court held: "Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews de novo." Wheeler, 226 Ill. 2d at 121. However, the supreme court in Wheeler cited with approval Blue, in which the supreme court had previously applied an abuse of discretion standard. Wheeler, 226 Ill. 2d at 121. In Blue and numerous other cases, our supreme court had held that the substance and style of closing argument is within the trial court's discretion, and will not be reversed absent an abuse of discretion. Blue, 189 Ill. 2d at 128, 132 ("we conclude that the trial court abused its discretion" by permitting certain prosecutorial remarks in closing); People v. Caffey, 205 Ill. 2d 52, 128 (2001); People v. Emerson, 189 Ill. 2d 436, 488 (2000); People v. Williams, 192 Ill. 2d 548, 583 (2000); People v. Armstrong, 183 Ill. 2d 130, 145 (1998); People v. Byron, 164 Ill. 2d 279, 295 (1995). Our supreme court had reasoned: "Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion." People v. Hudson, 157 Ill. 2d 401, 441 (1993). Following Blue and other supreme court cases like it, this court had

67

consistently applied an abuse of discretion standard.  People v. Tolliver, 347 Ill. App. 3d 203, 224 (2004), People v. Abadia, 328 Ill. App. 3d 669, 678 (2001).

Since Wheeler, appellate courts have been divided regarding the appropriate standard of review.  The Second and Third Divisions of the First District have applied an abuse of discretion standard, while the Third and Fourth Districts and the Fifth Division of the First District have applied a de novo standard of review. Compare People v. Love, 377 Ill. App. 3d 306, 313 (1st Dist. 2d Div. 2007) (Wolfson, J.) and People v. Averett, 381 Ill. App. 3d 1001, 1007 (1st Dist. 3d Div. 2008) (Quinn, J.) with People v. McCoy, 378 Ill. App. 3d 954, 964 (3d Dist. 2008), People v. Palmer, 382 Ill. App. 3d 1151, 1160 (4th Dist 2008), People v. Ramos, No. 1-07-3244 (1st Dist. 5th Div. December 4, 2009) (Toomin, J.) and Poeple v. Vargas, No. 1-08-1383 (1st Dist. 5th Div. November 20, 2009) (Toomin, J.).

However, we do not need to resolve the issue of the appropriate standard of review at this time,  because our holding in this case would be the same under either standard.  This is the same approach that we took in both Phillips and Johnson, and the same approach taken by the Second District in its recent Robinson opinion.  Phillips, 392 Ill. App. 3d at 275; Johnson, 385 Ill. App. 3d at

585; Robinson,391 Ill. App. 3d at 840 ("In any event, like the Johnson court, we leave the resolution of this issue to another day, as our conclusion would be the same applying either standard.").

(c). Substantial Prejudice

A State's closing will lead to reversal only if the prosecutor's remarks created "substantial prejudice." Wheeler, 226 Ill. 2d at 123, Johnson, 208 Ill. 2d at 64, People v. Easley, 148 Ill. 2d 281, 332 (1992) ("The remarks by the prosecutor, while improper, do not amount to substantial prejudice."). Substantial prejudice occurs "if the improper remarks constituted a material factor in a defendant's conviction." Wheeler, 226 Ill. 2d at 123.

When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney, in order to place the remarks in context. Wheeler, 226 Ill. 2d at 122, People v. Johnson, 208 Ill. 2d 53, 113 (2003), People v. Tolliver, 347 Ill. App. 3d 203, 224 (2004). A prosecutor has wide latitude during closing argument. Wheeler, 226 Ill. 2d at 123; Blue, 189 Ill. 2d at 127. "In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields." People v. Nicholas, 218 Ill. 2d 104, 121 (2005).

"Statements will not be held improper if they were provoked or invited by the defense counsel's argument." Glasper, 234 Ill. 2d at 204. For example, in Glasper, defendant argued that the prosecutor had "shifted the burden of proof to defendant when, in response to defendant's claim of a coerced confession, the prosecutor had stated in rebuttal closing: "Where's the evidence of that?" Glasper, 234 Ill. 2d at 212. Our supreme court held that the comment "did not shift the burden of proof to defendant," but that it merely "pointed out that no evidence existed in this case to support defendant's theory" and that it was "invited by defense counsel's argument." Glasper, 234 Ill. 2d at 212.

Similarly, in the case at bar, we find, for the reasons discussed below, that the prosecutor's comments in the rebuttal closing did not shift the burden of proof and were invited by the defense counsel's argument. Although we have reviewed the closing arguments in their entirety, we provide in this opinion only the remarks made by defense counsel to which the prosecutor responded, as well as the remarks by the prosecutor which defendant claims on appeal were objectionable.

(d) Contested Remarks

On appeal, defendant complains about three sets of remarks made by the

70

prosecutor during the State's rebuttal closing, claiming that: (i) one set shifted the burden of proof to defendant by implying that he should have requested scientific testing: (ii) a second set minimized the State's burden of proof; and (iii) and a third set bolstered the credibility of the police witnesses by invoking their authority as police officers.

(i) Scientific Testing

In closing argument, defense counsel discussed, at length, the lack of DNA and fingerprint testing, stating:

"The Chicago Police Department chose *** not to request any fingerprint evidence in this case. They chose not to request DNA evidence in this case, and they're the ones who are in custody of the supposed evidence.

Don't let the State try and shift that burden on us. We don't have custody of that evidence. They have custody of that evidence. And three days later, the person in the crime lab has custody of the evidence and is handling it without gloves because no requests have

been made.

> You don't have to accept that. You don't have to
> say that's okay. They didn't do a good enough job as
> far as that's concerned.
>
> And it's up to you to tell them that that is not
> acceptable."

On appeal, defendant challenges the following remarks which the prosecutor made in response. The State confirmed that defendant did not have a burden in this case, but noted that defense counsel had elicited testimony from the State's forensic expert that requests for DNA or fingerprint testing may be submitted by the police, the State, or the defense. Specifically, the prosecutor stated:

> "And you heard from ISP, the Illinois State Police
> Crime Lab, Miss Paula Bosco Szum. She as well,
> thousands of narcotics she's personally been given to
> analyze and she specified to you in what situations DNA
> or fingerprints is [sic] requested of those thousands of
> times.

> What she said matched exactly what the officer said.  Counsel is correct.  The defendant bears absolutely no burden in this case.  But she asked the question of Miss Szum to describe those circumstances.
>
> What was Ms. Szum's answer?  Sometimes, it's from the police of those two or three times, the State or the Defense."

After defense counsel argued in its closing "[d]on't let the State try and shift that burden on us," the State was almost forced to respond with a denial. The State's response included drawing the jury's attention to testimony that the defense had elicited on cross-examination.  During direct examination, the State had asked its forensic expert if both the State and the defense could  request DNA or fingerprint testing.  Instead of objecting to the question, the defense made the strategic decision to explore the topic on cross-examination, eliciting that a defense request had occurred only once during the career of that witness.  On appeal, the defendant cannot be heard to complain now about either an argument that he invited or testimony that he elicited.  Glasper, 234 Ill. 2d at 205 ("Defendant cannot complain that the State made reference to evidence in closing

No. 1-08-0194

which defendant helped elicit.")

(ii) Burden of Proof

Defense counsel ended her argument by discussing the State's burden to prove guilt beyond a reasonable doubt. The defense argued:

"Let's talk about reasonable doubt. No [recorded] funds. That's a reasonable doubt. No drugs recovered on [defendant]. That's a reasonable doubt. No video equipment used in this case. That's a reasonable doubt. No audio equipment used in this case. That's a reasonable doubt.

The circumstances of how this identification was constructed. That's a reasonable doubt. No DNA evidence. That's a reasonable doubt."

On appeal, defendant challenges the following remarks which the prosecutor made in response::

"[The defense] bear[s] no burden and let me say to you, ladies and gentleman, this burden, it's not an impossible burden.

74

> It's not something made up just for
>
> [defendant].   It is the same burden in every
>
> criminal case across the nation, our nation.  People
>
> are convicted and tried everyday under the same
>
> burden.  It's not impossible. It's not impossible."

The above remarks were invited by defense's remarks that the absence of any possible technological tool (DNA testing, video recording, etc.) created a reasonable doubt.  The reference to convictions occurring "every day" was not a reference that we condone; however, its impact was lessened by the State's immediately following comment that the State's burden was just short of "impossible."  Obviously, we on the appellate panel cannot know the tone with which this remark was delivered.  We know only that it was neither objected to by the defense counsel who heard it, nor cautioned by the trial court who also heard it.  From the cold and silent transcript, we cannot find reversible error from these words.

### (iii) Police Credibility

Concerning the police officers' credibility, defense counsel argued in closing:

"Let's talk about the circumstances of the undercover police officer.

This person, as he described, he's talking to for three to five seconds. Bam, that's it, and you're going to buy that they gave this detailed description of what this individual looked like?

You know how they know what [defendant[ was wearing? [Defendant] was arrested. ***

Of course, [defendant] is going to get identified during this drive by identification because he's the only individual that is standing there in the custody of two Chicago police officers."

Defense counsel accused the police officers of "a lazy job of doing their police work."

In the State's rebuttal closing, the prosecutor responded:

"We are not hiding anything from you, ladies and gentlemen. They want you to believe that these officers are, that they are just lazy and trying to pin cases on this

76

defendant.  But why?  That's what you need to ask

yourself.

They basically want you to believe that these

officers are here risking their careers individually and

collectively. Why?  For him?  For less than a gram of

cocaine?  Does that make any sense to anyone? "

Without any evidence in the record of police fraud or misconduct, defense counsel argued in her closing argument that the police misidentified or framed her client in order to make an arrest.  In rebuttal, the State responded: "Why?"  In light of the defense's remarks, the State's response was not inappropriate, and thus no error occurred.

The remarks, quoted above, certainly did not rise to the level of plain error. Even if the remarks constituted error, they were harmless, in light of the overwhelming evidence against defendant, which was already discussed in subsection (3)(g) of this opinion.

## CONCLUSION

For the foregoing reasons, we affirm defendant's conviction.  We find, first,  that the trial court did not abuse its discretion by giving the jury the third

paragraph of IPI Criminal 4th 17.05A, which clarified that a drug delivery could occur without the transfer of money or other consideration. Second, the trial court did not abuse its discretion by allowing police officers to testify about radio messages received from other police officers, who were also trial witnesses. Third, the trial court did err by failing to ask potential jurors whether they understood and accepted the four legal principles listed in Illinois Supreme Court Rule 431(b); however, the error was harmless. Fourth, defendant failed to preserve his objection to the trial court's refusal to rule, until after defendant testified, on his motion in limine concerning the admissibility of his prior convictions for impeachment purposes. Fifth, the prosecutor did not commit misconduct in the State's rebuttal closing argument,

when she responded to remarks made during the defense closing.

Affirmed.

CAHILL , P.J., and J. GORDON, J., concur.