2022 IL App (2d) 210555-U
No. 2-21-0555
Order filed May 31, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JOSHUA McELROY, | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-MR-19 |
| | ) | |
| OSWEGO FIRE PROTECTION DISTRICT, | ) | |
| an Illinois municipal corporation, and MIKE | ) | |
| VESELING, Fire Chief of the Oswego Fire | ) | |
| District, | ) | Honorable |
| | ) | Stephen Krentz, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Trial court did not err in granting summary judgment in favor of defendant where plaintiff failed to establish that he suffered a pre-deprivation violation of his due process rights; other issues were moot.

¶ 2                                    I. INTRODUCTION

¶ 3   Plaintiff, Joshua McElroy, appeals the grant of summary judgment entered in favor of defendant, Mike Veseling (defendant or Veseling), by the circuit court of Kendall County (plaintiff's appeal does not concern the Oswego Fire Protection District (the District) (where

necessary, we refer to Veseling and the District collectively as defendants). Plaintiff alleges he was denied due process in his purported termination from employment with defendant. Specifically, plaintiff argues that he was deprived of his right to pre-termination due process protections; that the trial court erroneously determined that he had voluntarily resigned; that the availability of a post-termination remedy constituted insufficient process to safeguard his rights; and that the trial court erred in finding defendant was entitled to qualified immunity. For the reasons that follow, we affirm.

¶ 4                                    II. BACKGROUND

¶ 5     Plaintiff was employed by the District as a paramedic. Paramedics must be licensed. His license lapsed in June 2018. This was discovered in January 2019. Plaintiff was given the choice of resigning or going through a disciplinary process. Plaintiff resigned.

¶ 6     In his discovery deposition, plaintiff testified that he first got his paramedic license in October 1998. Paramedic licenses are valid for four years. Licenses are issued through the Southern Fox Paramedic System. He worked as a paramedic for two other employers before becoming employed by the District in 2005 in a contract position. In 2008, he became a full-time, commissioned firefighter/paramedic with the District. Plaintiff was aware that he had to maintain a license as a condition of employment. Typically, when his license needed to be renewed, he was contacted by Southern Fox by letter. Plaintiff did not recall receiving notice from anyone other than Southern Fox. Typically, plaintiff would receive one-months' notice. When a license needed to be renewed, one would give a copy of the license to the EMS coordinator, Matt Goodbred.

¶ 7     Plaintiff agreed that his license expired in 2018. He further agreed that keeping track of the expiration of his license was his responsibility. Nevertheless, he alleged that, in 2018, he never received a renewal notice from Southern Fox. Plaintiff had moved prior to 2018, and he stated

that he had provided Southern Fox with his new address. Plaintiff further agreed that he had practiced as a paramedic for six or seven months without a license.

¶ 8    Plaintiff testified that he first became aware that his license had expired on January 7, 2019. Prior to this date, plaintiff had approached Goodbred "a couple times to check into [his] address update." Goodbred told plaintiff to check with Edwin Huelstrunk at Southern Fox. Plaintiff did so, and, while speaking to Huelstrunk in the spring of 2018, told him that he had misplaced his physical license. Huelstrunk told plaintiff that he should not "worry about it, [as] it's in electronic files, and [plaintiff would] be notified a month before." On January 7, 2019, he inquired of Goodbred regarding his license, and Goodbred checked into its status. Goodbred is an employee of the District. Plaintiff stated that, between June 2018 and January 2019, he had a couple conversations with Goodbred regarding his license status.

¶ 9    On January 7, 2019, plaintiff was working. He approached Goodbred and told him that they needed to look into his license status. Goodbred pulled up records and learned plaintiff's license had been expired for six months. Goodbred said that he needed to contact some people, and that he would get back to plaintiff. Later that day, plaintiff was working at Station 3. Lieutenant Craig Barz informed plaintiff that the battalion chief had ordered plaintiff to report to Station 1 for a meeting. Plaintiff was instructed to use his personal vehicle to get there. Barz did not tell plaintiff the purpose of the meeting.

¶ 10    Plaintiff arrived at Station 1 and went to the conference room. The president of the local chapter of the union, Robert Carpenter, was there. Also present were Chief Veseling (defendant), Chief Flanders, Chief Cornish, Chief Warren, and Acting Chief Cave. Cornish "did the talking." Cornish said that he had one yes-or-no question: did plaintiff have a paramedic license? Claimant stated, "No." Cornish said that claimant was on administrative leave, effective immediately, and

he directed plaintiff to Goodbred to get his license reinstituted. No other questions were directed to claimant that day. Claimant was directed to report to the conference room at 6:45 a.m. on his next duty day, which was January 10, 2019. Prior to the January 10 meeting, plaintiff had gathered paperwork from Goodbred and had gone to Southern Fox. Southern Fox gave him a packet and some instructions regarding how to remedy the situation. Plaintiff hand-carried the required documents and payment to Springfield and turned them in. Plaintiff was not immediately recertified and was informed that he might have to take some additional steps due to the amount of time he was unlicensed.

¶ 11   On January 10, plaintiff arrived at Station 1 as directed. Cornish informed him that there might be a delay. While he was waiting, he was contacted by the licensing authority and informed he would have to take a test before he was reinstated. However, later that morning, plaintiff was informed that they would "move forward with the relicensure." He was also informed that his address had never been updated and that they were having some issues with Huelstrunk (though they did not disclose what sort of issues). Plaintiff clarified that some of these calls took place between January 7 and January 10. At some point, plaintiff moved to the union office. He completed an online payment, and his license was reinstated that morning. Claimant asked Carpenter for his opinion about the matter. Claimant related Carpenter's opinion:

"And he said, I'm really scared for you at this point in time. I'd hate to see them press criminal charges which they have been advised that they could do and you to be taken away in handcuffs, and I looked at him and said, Obviously that's not a situation I want to be part of with a wife and six kids, and he was saying—he said, Well, that's where they're at right now, and they're getting antsy in the boardroom and want a reply from you shortly here. And I said, Well, what's the reply? And he said, They're going to give you two

options, that you can be terminated or you can resign."

Carpenter was the first person to mention criminal sanctions to plaintiff. Carpenter told plaintiff that the District had consulted with counsel and been informed the there was potential criminal liability for plaintiff. Plaintiff agreed that "no chief officer ever said that to [him.]" Carpenter told plaintiff that he had to resign or would be terminated. Plaintiff stated that he did not understand the process as he does now, but he was aware that there was some process as to how discipline occurred embodied in the collective bargaining agreement applicable to him. When asked whether he was aware that the Chief could not simply fire him, he stated, "I wasn't sure of that, no." Regarding claimant's possible criminal liability, plaintiff stated that Carpenter "made the statement in reference to the chiefs" and "their legal counsel."

¶ 12    Plaintiff, Carpenter, and another individual from the union (Tyler) returned to the conference room and met with Veseling, Cornish, and Flanders. Cornish stated, "This is going to pretty much be a one-way conversation." He continued, "You have two choices, and one of them is going to be to go through the termination process and the other is going to be to resign." Claimant stated, "I believe I'm going to have to resign." Cornish had plaintiff go to Cornish's office and type a resignation letter. Plaintiff said he was not sure what he should say, and Cornish "gave [him] two sentences." As they left the office, Goodbred stopped Cornish and informed him that plaintiff's license had been renewed.

¶ 13    In the resignation letter, plaintiff wrote, "I have made this choice for personal reasons." Plaintiff agreed that he could have chosen not to resign. If he did not, he would have gone through the disciplinary process; however, plaintiff stated that it was his understanding that the union would not back him. Plaintiff acknowledged that when he met with defendant on January 10, they did not ask him any questions. Carpenter advised plaintiff that the union did not see things ending

favorably for plaintiff and opined that it would be best for plaintiff to resign. Plaintiff did not ask to consult with an attorney. Plaintiff acknowledged that he heard about the possibility of criminal sanctions from Carpenter and that when he met with the chiefs on the day he resigned, the only thing they said was that plaintiff had two options, resignation or the disciplinary process. Plaintiff later stated that the choice he was given was between resignation and termination.

¶ 14    Plaintiff testified that he was aware that the collective bargaining agreement under which he and the District operated contained rules and procedures concerning terminating or disciplining an employee.

¶ 15    Veseling also testified via discovery deposition. He stated that he is the Fire Chief of the Oswego Fire Protection District. Veseling testified that paramedics are required to be licensed by the Illinois Department of Public Health. Matt Goodbred is the District's Emergency Medical Services Coordinator. It is Goodbred's responsibility to ensure that all personnel are properly licensed. On January 7, 2019, plaintiff was ordered to report to the station for a meeting. The purpose of the meeting was to ask plaintiff if he had a paramedic license. Not having a license would be a cause for disciplinary action. When asked whether this would include suspension or termination, Veseling answered that it would depend on what the evidence showed. Plaintiff was not advised that he could be represented by counsel, and he was not given any sort of document outlining why he was potentially subject to discipline. Veseling added that they "hadn't launched an investigation at that point." During this meeting, Chief Cornish, at the direction of Veseling, asked plaintiff whether he had a paramedic license. Plaintiff stated that he did not. Veseling told Cornish to place plaintiff on administrative leave, and Cornish did so. Plaintiff was told to report back at 6:45 a.m. on his next duty day, which was January 10, 2019.

¶ 16    Plaintiff reported to the meeting on January 10. Three chiefs were present in addition to

Veseling, as were three representatives of the union, including Carpenter. Veseling stated that plaintiff would have to resign or "face disciplinary action through our normal process." Veseling testified that he could not say whether discipline would include a recommendation for termination, as an investigation had not yet been conducted. Factors relevant to this determination included: whether plaintiff's failure to renew his license was intentional, whether plaintiff knew his license was expired, and "[h]ow the whole failure to re-license occurred." Veseling agreed that there could have been mitigating circumstances that would have made discipline less severe than termination appropriate. Veseling agreed that he never advised plaintiff that any charges were being levied against him. Veseling directed Cornish to inform plaintiff that he would have to resign or go through the disciplinary process. Veseling stated that plaintiff was never actually asked whether he wished to resign or undergo the disciplinary process, as Carpenter informed the chiefs that plaintiff intended to resign at the beginning of the January 10 meeting.

¶ 17    On cross-examination, Veseling testified that while plaintiff was on administrative leave, he was still paid. The January 7 meeting was not for the purpose of disciplining plaintiff; rather, it was simply to determine if plaintiff could continue to practice as a paramedic.

¶ 18    A discovery deposition of Carpenter was also conducted. At the time of plaintiff's resignation, Carpenter was the president of the local union. A collective bargaining agreement exists between the union and the District. It contains a grievance process. Carpenter testified that paramedics were required to maintain a license. When a license is due for renewal, a paramedic typically gets a letter from the State. Carpenter recalled the January 7 meeting where plaintiff was asked whether he had a paramedic license. Carpenter was there to represent plaintiff, and he would have objected if plaintiff's rights had been violated. Neither the union nor plaintiff filed a grievance.

¶ 19    Carpenter was also present for the January 10 meeting.  He met with plaintiff before that meeting and did not recall telling plaintiff that he could end up being led out of the meeting in handcuffs.  He did recall discussing whether criminal charges could follow, as plaintiff had been doing things like handling narcotics while unlicensed, but no one told plaintiff he was going to be charged with a crime.  Carpenter told plaintiff he could "buy him some time if he needed to think about things or try to figure out the direction he wanted to go."  Plaintiff decided he wanted to resign.  Following the meeting, plaintiff never attempted to file a grievance with the union regarding how he had been treated.

¶ 20    On cross-examination, Carpenter agreed that when he met with plaintiff prior to the January 10 meeting, he told plaintiff that the District "had a pretty good case against him."  Carpenter did not recall speaking with any of the chiefs about the matter.  He was aware that this "was something that could have resulted in charges being filed against" plaintiff.    Carpenter characterized the meeting as an "informal inquiry," which he explained was a "simple fact-finding mission to see if there is any cause to move further to see if there is need for discipline."  Carpenter reiterated that he did not recall meeting with any of the chiefs to discuss plaintiff's situation prior to the January 10 meeting.  He did recall speaking with plaintiff about possible criminal charges prior to the January 10 meeting.  Carpenter testified that he had not discussed criminal sanctions with the chiefs.  Carpenter opined that there was nothing wrong with the process afforded plaintiff in the meetings that led to his resignation.

¶ 21    The trial court granted summary judgment in favor of defendants.  Pertinent here is the court's ruling on the second count of plaintiff's complaint alleging constitutional violations directed at Veseling.  In the second count, plaintiff alleges he was deprived of his right to procedural due process in that he was constructively discharged by Veseling without adequate

notice and an opportunity to be heard. The court noted that there were two ways a plaintiff could prevail on an involuntary resignation claim—coerced resignation or constructive discharge. The first, which is applicable here, required evidence that the plaintiff was given "a Hobson's choice in which the employee must resign or suffer severe consequences, such as facing criminal charges." See *Palka v. Shelton*, 623 F. 3d 447, 453 (7th Cir. 2010). The trial court stated, "this court finds no evidence of any coercion or duress that can be attributed to actions or statements of any of the involved defendants." The court then noted that being forced to choose between resignation and discipline was insufficient to make such a showing. *Id*.

¶ 22    Plaintiff further argued that his decision to resign was not voluntary because he was advised that the investigatory process could lead to criminal charges. The trial court rejected this claim, noting that plaintiff testified that none of the chiefs ever said anything to him about criminal sanctions. The only evidence that could possibly support plaintiff's position is his own testimony regarding the conversation he had with Carpenter prior to the January 10 meeting. Specifically, Carpenter stated he was worried about the possibility of criminal sanctions and that the District had retained counsel and determined that this was a possibility. However, Carpenter testified that he had no recollection of telling plaintiff he could be led out in handcuffs. He further stated that no one told plaintiff he would be charged with a crime. Further, Carpenter did not recall discussing criminal sanctions with the chiefs prior to the January 10 meeting.

¶ 23    The trial court then noted that inadmissible hearsay may not be admitted to support or oppose a motion for summary judgment. *People ex rel. Madigan v. Kole*, 2012 IL App (2d) 110245, ¶ 47. The only evidence that would support an inference that Veseling acted in a manner to coerce plaintiff to resign rather than face criminal charges is plaintiff's testimony that Carpenter told him that the chiefs said something about criminal sanctions. The trial court ruled that this was

inadmissible hearsay. Accordingly, plaintiff had offered no competent evidence that Veseling or any of the chiefs had threatened plaintiff with criminal sanctions if he did not resign.

¶ 24 The trial court then considered plaintiff's argument that the fact that he was forced to make an immediate decision about resignation was coercive. The trial court noted that Carpenter told plaintiff he could "buy him some time," but plaintiff chose not to avail himself of this offer. Thus, the trial court concluded, plaintiff's failure to seek additional time belies plaintiff's claim.

¶ 25 The trial court then addressed whether claimant's post-deprivation remedies were inadequate to vindicate his due process rights. It ultimately found that plaintiff's failure to seek such a remedy foreclosed his due process claim. As we, like the trial court, conclude that there was no pre-deprivation violation of plaintiff's due process rights, we need not consider the adequacy of his post-deprivation remedies.

¶ 26 The trial court also found that Veseling was entitled to qualified immunity. Assuming, *arguendo*, the pre-deprivation process afforded plaintiff was inadequate, the court concluded that Veseling did not violate a clearly established right belonging to plaintiff. It stated, "Plaintiff fails to identify any authority holding that the specifically alleged procedural violations of the Firemen's Disciplinary Act amounted to a constitutionally protected due process violation, or that even if it was, that it was sufficiently clear to Chief Veseling that his conduct violated Plaintiff's due process rights at the time of the challenged conduct."

¶ 27 Accordingly, the trial court granted summary judgment in favor of defendants. This appeal followed.

¶ 28                                     III. ANALYSIS

¶ 29 On appeal, plaintiff advances three main arguments. First, he contends that the process afforded him prior to his resignation was an affront to due process. The key issue here is whether

plaintiff's resignation was coerced, for if plaintiff voluntarily resigned, he cannot colorably assert a due process violation. Although plaintiff cites some cases that involved constructive discharges, plaintiff clarified at oral argument that he is advancing a coerced-resignation theory in this case. Second, plaintiff contends that post-deprivation remedies were not adequate to cure the pre-deprivation denial of his due process rights. As we determine that no pre-deprivation violation occurred, we need not address this issue further. Third, plaintiff argues that the trial court erred in determining that Veseling was entitled to qualified immunity. However, as plaintiff failed to establish that he suffered from a denial of due process, this argument is moot as well.

¶ 30    Before proceeding further, we reject defendant's assertion that plaintiff's due process claim was not raised before the trial court and is waived. See *Jacobson v. Gimbel*, 2013 IL App (2d) 120478, ¶ 34. We note that in his complaint, plaintiff alleged that he had a property interest in his continuing employment and that he was entitled to a hearing "both before and after the termination of his employment." He also alleged that his resignation resulted from duress. As this issue was adequately addressed below, we find that it is not forfeited.

¶ 31    As this appeal comes to us following a grant of summary judgment, review is *de novo*. *Seymour v. Collins*, 2015 IL 118432, ¶ 49. A motion for summary judgment should not be granted unless there are no genuine issues of material fact and the movant's right to judgment as a matter of law is clear and free from doubt. *Id*. The record must be construed strictly against that movant and liberally in favor of the opponent of the motion. *Id*. If reasonable people could draw different, relevant inferences from the record, a grant of summary judgment is not appropriate. *Id*. We now turn to plaintiff's arguments.

¶ 32                    A. PRE-DEPRIVATION DUE PROCESS

¶ 33    Plaintiff first contends that he was denied due process prior to the point at which he

resigned from his position. It is undisputed that plaintiff has a property interest in continued employment. See *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538-39 (1985). Once that interest is conferred upon an employee, it may only be terminated in accordance with due process. *Id.* at 541. Thus, before such an employee is terminated, he or she is entitled to (1) notice of the proposed basis for termination, (2) hear the evidence the employer relies upon, and (3) a chance to be heard. *Id.* at 546. Plaintiff asserts that he was given neither notice of the charges against him nor an opportunity to respond. Defendant counters that plaintiff voluntarily resigned. A public employee who resigns voluntarily is not entitled to due process relative to the cessation of his or her employment. *Palka v. Shelton*, 623 F. 3d 447, 453 (7th Cir. 2010). Plaintiff responds that his resignation was not voluntary. As a preliminary matter, we must assess whether plaintiff's resignation was voluntary.

¶ 34    Generally speaking, there are two types of involuntary resignations—coerced resignation and constructive discharge: "Constructive discharge occurs when an employer makes employment so unbearable that an employee resigns; coerced resignation is characterized by the presence of a Hobson's choice in which the employee must resign or suffer severe consequences, such as facing criminal charges." *Id*. Here, plaintiff asserts the latter theory (he mentions constructive discharge in his brief and cites cases that are based on that theory but never explains how defendants made his continued employment unbearable). He asserts that he made the decision to resign under threat of possible criminal charges and that he was not given adequate time to consider his options.

¶ 35    Regarding the threat of criminal charges, plaintiff agrees "that no one from [the District's] management team mentioned the threat of criminal charges." However, he points out that he testified that Carpenter told him that Carpenter "had met with the department and had been notified that there is a potential of criminal charges and your being taken out in handcuffs." The trial court

found that this was hearsay and could not be relied on by plaintiff to defeat the summary judgment motion. Plaintiff asserts that this statement was not being offered for the truth of the matter asserted but for the effect it had on his state of mind. Statements offered for such a purpose are not hearsay. *People v. Hammonds*, 409 Ill. App. 3d 838, 854 (2011); Ill. R. Evid. 803(3)(B) (eff. April 26, 2012). If plaintiff's testimony were offered to show that Carpenter threatened him with criminal sanctions, the statement would be admissible if offered for the effect it had upon plaintiff but not for the truth of whether plaintiff would be criminally liable. However, here, there is another component to Carpenter's statement that concerns the truth of the matter asserted, specifically, that the threat could be attributed to the chiefs. The effect that this statement had on plaintiff does not matter if it did not come from defendant. To attribute the threat to defendant, one must take as true plaintiff's statement that Carpenter's had met with the District and been informed there was a potential for criminal charges. Plaintiff suggests no basis for this component of this testimony to avoid the hearsay rule. Thus, the trial court properly disregarded this testimony. Moreover, Carpenter testified that he had not discussed criminal sanctions with the chiefs. Thus, for the purpose of resolving this summary judgment motion, nothing in the record would allow the statements about criminal sanctions to be attributed to defendant.

¶ 36     The mere fact that plaintiff had to choose between resigning and being subject to the disciplinary process is insufficient to deem plaintiff's resignation coerced. *Palka* addresses precisely this situation:

> "No doubt Palka was confronted with a difficult choice when the disciplinary charges were lodged against him and the Merit Board hearing loomed. He could retire with full benefits or appear before the Board and potentially be vindicated; the latter option, however, obviously risked termination and loss of his benefits if the charges were

substantiated. But this is not the kind of choice that makes an otherwise voluntary resignation involuntary. The Merit Board provides adequate procedural protections to Cook County employees facing disciplinary charges, and its formal procedures were underway when Palka chose to resign. The Merit Board's disciplinary process satisfies the County's procedural due-process obligations, and the County and its officials cannot be held liable when an employee chooses not to avail himself of its protections. [Citation.] That Palka decided to resign rather than risk an unfavorable Merit Board decision does not make his resignation involuntary." *Palka*, 623 F.3d at 453.

Plaintiff attempts to distinguish *Palka* by pointing out that disciplinary proceedings were already under way in that case. While true, the salient point in *Palka* was that the choice between resignation and discipline did not render resignation coerced. That the plaintiff in *Palka* received some degree of process does not meaningfully distinguish the case. Plaintiff asserts that the plaintiff in that case had already been presented with written charges; however, it is unclear to us how that would have altered plaintiff's decision here. Plaintiff asserts that the *Palka* plaintiff had more time to consider his situation. However, plaintiff's claim that he was given inadequate time to consider his choice falls flat in light of Carpenter's uncontradicted testimony that plaintiff did not avail himself of Carpenter's offer to obtain more time for him to make a decision. In short, *Palka* is sufficiently similar to this case that its rationale applies here. See also *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982) (The *Dusanek* court held that "it is not a deprivation of due process of law to be put to the option of defending oneself in a proper dismissal hearing or voluntarily accepting a change in one's job status." Plaintiff attempts to distinguish *Dusanek* on the basis that the plaintiff in that case had a sufficient "opportunity for deliberation." Given that plaintiff did not avail himself of Carpenter's offer for more time, nothing in the record supports

plaintiff's assertion that he did not have adequate time to consider his options.).

¶ 37    Indeed, in *Allen v. Board of Trustees of Community College District No. 508*, 285 Ill. App. 3d 1031, 1034 (1996), the plaintiffs argued that their resignations were involuntary where the defendant allegedly "made the deliberate misrepresentations that [the] plaintiffs violated criminal laws" in an effort to "extort involuntary resignations." The *Allen* court rejected this argument. It first held, "Because [the] defendants had a *prima facie* basis to discharge [the] plaintiffs, their resignations given to avoid dismissal cannot be considered to have been given under duress." *Id.* at 1035. Here, plaintiff's failure to maintain a paramedic license constituted similar grounds. Moreover, in *Allen*, the court noted that there was no evidence that the defendants "falsely held beliefs that [the] plaintiffs might have committed crimes." *Id*. at 1036. Similarly, a person could conclude that plaintiff in this case could be subject to potential criminal prosecution for practicing as a paramedic, to include dispersing medicine, without a license. Thus, assuming *arguendo*, the chiefs did hold such a belief, it would not have been unfounded. The *Allen* court continued: "Even if [the] defendants' belief that federal crimes were committed was incorrect, we hold that as a matter of law plaintiffs were not coerced into resigning but voluntarily resigned. Defendants had an indisputable basis for bringing dismissal proceedings, and plaintiffs were given a choice between resigning or contesting the charges." *Id.* at 1036. This logic applies here. While it is true that the plaintiffs in *Allen* received written charges prior to resigning (*id.* at 1037), that isolated fact is insufficient to distinguish the persuasive force of *Allen's* reasoning in light of its compelling similarities with this case.

¶ 38    Plaintiff calls our attention to *Paroczav v. Hodges*, 219 F. Supp. 89 (1963), which he asserts is "more consistent with the facts" of this case. In that case, the plaintiff was aware of the charges against him for one day before his employer demanded he immediately resign or face disciplinary

proceedings. *Id.* at 91. The court determined that the plaintiff's resignation was involuntary because he had been forced to make an immediate decision. *Id.* at 94. However, the plaintiff in *Paroczav* "specifically requested and [was] denied" time to consider his decision. *Id.* Here, plaintiff chose to proceed despite Carpenter telling him he could "buy him some time if he needed to think about things." Thus, the record indicates that plaintiff had an adequate opportunity to consider his decision. *Paroczav* is distinguishable on this basis.

¶ 39 Plaintiff also points to *Kodish v. Oakbrook Terrace Fire Protection District*, 604 F. 3d 490 (7th Cir. 2010); however, that case is plainly inapposite. In *Kodish*, the plaintiff was given a choice between resigning and being immediately terminated. *Id.* at 502. Here, plaintiff was offered the choice between resigning and facing a disciplinary process. There is no indication in the record that this procedure would not have satisfied due process concerns or, for that matter, that it would have necessarily led to termination. *Kodish* is therefore distinguishable.

¶ 40 Similarly, plaintiff's citation to *Ciambriello v. County of Nassau*, 292 F.3d 307, 322-23 (2nd Cir. 2002), is unavailing. In that case, the plaintiff was demoted in clear degradation of his due process rights and he challenged the demotion in a court action rather than in accordance with the terms of a collective bargaining agreement (CBA) under which the parties operated. *Id.* at 312. The defendant argued that his failure to take advantage of the procedures available in the CBA constituted a waiver of his due process rights. *Id.* at 323. The court rejected this claim, explaining that the plaintiff's due process rights and rights established by a CBA are not commensurate. *Id.* *Ciambrello* is dissimilar to this case in that the plaintiff there did not voluntarily resign; in fact, he did not resign at all. He simply elected to attempt to vindicate his due process rights in court rather than through the CBA. Here, plaintiff elected to resign, abandoning both any rights he may have had under a CBA as well as his due process rights. Thus, *Ciambrello* involved a different situation

than the one that confronts us here.

¶ 41    In sum, plaintiff has not set forth sufficient facts to persuade us that his resignation was involuntary. As such, he cannot now complain of a violation of his due process rights.

¶ 42                              B. OTHER ISSUES

¶ 43    As we have determined plaintiff has failed to set forth evidence that his right to procedural due process was violated prior to his resignation, we have no occasion to address his argument that post-deprivation remedies were inadequate to protect his due process rights. Moreover, whether Veseling would be entitled to qualified immunity is also moot.

¶ 44                              IV. CONCLUSION

¶ 45    For the foregoing reasons, the judgment of the circuit court of Kendall County is affirmed.

¶ 46    Affirmed.